Slip Op. 02-114

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

|  |  |  |
|---|---|---|
| _____ x | | |
| ALLEGHENY LUDLUM CORP., *ET AL.*, | **:** | |
| Plaintiffs, | **:** | Consolidated Court No. 99-09-00566 |
| v. | **:** | |
| UNITED STATES, | **:** | |
| Defendant | | |
| | **:** | |
| and | | |
| | **:** | |
| USINOR, UGINE S.A., AND UGINOX SALES CORPORATION, *ET AL.*, | **:** | |
| Defendant-Intervenors. | **:** | |
| _____ x | | |

[Department of Commerce's Redetermination Pursuant to Remand Sustained]

Decided: September 24, 2002

*Collier Shannon Scott, PLLC, Paul C. Rosenthal, Kathleen W. Cannon, Lynn Duffy Maloney,(John M. Herrmann)*, for Plaintiffs.

*Robert D. McCallum*, Jr., Assistant Attorney General, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Thomas B. Fatrouros)*; *Michele D. Lynch*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Weil, Gotshall & Manges LLP, (Stuart M. Rosen), Jonathan Bloom, Jennifer J. Rhodes,* for Defendant-Intervenors.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

This opinion constitutes the latest writing in a continuing effort of this court to clarify the statutory and case law concerning when non-recurring subsidies can continue to be countervailable after a formerly subsidized business entity is privatized. The court now reviews the Department of Commerce's ("Commerce" or "Department") *Results of Redetermination Pursuant to Court Remand, Allegheny Ludlum Corp., et al. v. United States*, Court No. 99-09-00566 (CIT Jan. 4, 2002) (June 3, 2002) ("*Remand Determination II*"). This case originated pursuant to Plaintiffs' and Defendant-Intervenors' USCIT R. 56.2 Motions for Judgment Upon an Agency Record. Defendant-Intervenors challenged certain aspects of the final determination of the Department of Commerce International Trade Administration's countervailing duty investigation of carbon-quality steel plate from France. *See Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip Coils from France*, 64 Fed. Reg. 30,774 (June 8, 1999) ("*Final Determination*"). While Commerce's *Final Determination* was pending before the court, the Federal Circuit issued its opinion in *Delverde SrL v. United States,* 202 F.3d 1360 (Fed. Cir. 2000), *reh'g denied,* Court. No. 99-1186 (June 20, 2000) ("*Delverde III*"). *Delverde III* required Commerce to examine the facts and circumstances of the privatization transaction itself to determine whether previously bestowed subsidies "passed through" to the new owners.

On February 29, 2000, Usinor filed, and the court granted, a motion to amend its complaint to add a claim based upon the Federal Circuit's ruling in *Delverde III*. On July 13,

2000, Defendant United States, requested a remand to Commerce to consider the impact of the Federal Circuit's holding in *Delverde III* to the facts of this case.  The subsequent remand order instructed Commerce to "issue a determination consistent with the United States law, interpreted pursuant to all relevant authority, including the decision of the Court of Appeals for the Federal Circuit in *Delverde SrL v. United States* 202 F.3d 1360 (Fed. Cir. 2000)."  *Remand Order* (August 15, 2000).  The court reviewed Commerce's *Final Results of Redetermination Pursuant to Court Remand: Allegheny-Ludlum Corp.,* et al. *v. United States,* Court No. 99-09-00566 (December 20, 2000) ("*Remand Determination I*") in *Allegheny Ludlum Corp.,* et al. *v. United States*, 26 CIT __ ,182 F. Supp 2d. 1357 (2002) ("*Allegheny I*").[1]  The court found that Commerce had developed a methodology that circumvents its statutorily mandated duty, under 19 U.S.C. § 1677(5)(F), to determine if a benefit was conferred on the privatized corporation.  Therefore, the court remanded the case to Commerce and ordered that Commerce look at the facts and circumstances of the transaction as *Delverde III* required to determine if the purchaser received a subsidy, directly or indirectly, for which it did not pay adequate compensation.  *See Allegheny I*, 182 F. Supp. 2d at 1366.  The court now reviews Commerce's actions taken pursuant to its instructions.  The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994), which provides for judicial review of a final determination by the Department of Commerce in accordance with the provisions of 19 U.S.C. § 1516a(a)(2)(B)(I) (1994).

## II. BACKGROUND

---

[1] This case is a companion case to *GTS Industries S.A. v. United States,* 26 CIT ___, 182 F. Supp. 2d 1369 (2002).  GTS Industries, formerly a subsidiary of Usinor, produced and imported products into the United States that were also subject to a countervailing duty investigation.  The same privatization transaction is at issue in both cases.

Familiarity with the facts presented in *Allegheny I* is presumed; however, a brief summary

of the facts is necessary to delineate the pending issues in Commerce's *Remand Determination*

*II*.  On July 13, 1998, Commerce initiated countervailing duty investigations to determine

whether manufacturers, producers or exporters of stainless steel sheet and strip from France, Italy

and the Republic of Korea were receiving countervailable subsidies.  *See Initiation of*

*Countervailing Duty Investigations: Stainless Steel Sheet and Strip in Coils From France, Italy*

*and the Republic of Korea,* 63 Fed. Reg. 37,539 (July 13, 1998).  The period of investigation was

calender year 1997.  *Id.*  Commerce issued its preliminary affirmative determination on

November 17, 1998, and its final affirmative determination on June 8, 1999, finding that the total

estimated net countervailable subsidy ("CVD") rate was 5.38% *ad valorem* for Usinor and all

others.  *See Preliminary Affirmative Countervailing Duty Determination and Alignment of Final*

*Countervailing Duty Determination With Final Antidumping Duty Determination:  Stainless*

*Steel Sheet and Strip in Coils from France*, 63 Fed. Reg. 63,876 (Nov. 17, 1998); *Final*

*Determination*, 64 Fed. Reg. 30,790.  During the investigation, the Government of France

("France" or "French Government") identified a division of Usinor as the sole French producer

of the subject merchandise that was exported to the United States during the period of

investigation.  The French Government was the majority owner of Usinor and Sacilor, another

steel producer, until the mid-1980s.  *Final Determination*, 64 Fed. Reg. at 30,776.  After a capital

restructuring in 1986, France was the sole owner of both companies.  *Id*.  In 1987, France placed

Usinor and Sacilor under the ownership of a holding company, with the holding company

retaining Usinor as its name.  *Remand Determination I* at 17.  In 1991, Credit Lyonnais, a

government-owned bank, purchased 20% of Usinor. *Final Determination*, 64 Fed. Reg. at

30,776. Beginning in the summer of 1995 and continuing through 1996 and 1997, the French

Government privatized Usinor through a public stock offering. *Id.* By the end of 1997,

approximately 82% of Usinor's shares were owned by private shareholders, with the remaining

shares owned by employees and "stable shareholders." *Remand Determination I* at 17.

Despite the public stock offering that privatized Usinor, Commerce concluded in *Remand*

*Determination I* that Usinor was the "same person" and thus, the previously determined subsidies

automatically passed through after privatization. *Id*. at 15.[2]  In making its "same person" finding

Commerce used principles of United States law "in the general corporate context." *Id.* at 10.

In its original determination, Commerce formulated a new two-step inquiry to determine

if prior subsidies passed through to the new privatized entity.

> Consistent with the Federal Circuit's analysis in *Delverde III*, Commerce
> announced a two-step inquiry. Commerce first analyzes whether the pre-sale and
> post-sale entities are for all intents and purposes the same person. If they are,
> Commerce's analysis stops, as all of the elements of a subsidy will have been
> established with regard to the producer under investigation, *i.e.*, the post-sale

---

[2]  To determine if Usinor was the same "person" Commerce used a four-factor test based on general corporate law principles.

> [W]here appropriate and applicable, we would analyze such factors as (1)
> continuity of general business operations, including whether the successor holds
> itself out as the continuation of the previous enterprise, as may be indicated, for
> example, by the use of the same name, (2) continuity of production, (3) continuity
> of assets and liabilities, and (4) retention of personnel. . . . [T]he Department will
> generally consider the post-sale entity to be the same person as the pre-sale entity
> if, based on the totality of the factors considered, we determine that the entity sold
> in the change-in-ownership transaction can be considered a continuous business
> entity because it operated in substantially the same manner before and after the
> change in ownership.

*Remand Determination I* at 14-15 (footnote omitted).

> entity. However, if the two entities are not the same person, Commerce will proceed to the second step in its inquiry and will examine whether a subsidy has been provided to the post-sale entity through the change-in-ownership transaction itself.

*Allegheny I,* 182 F. Supp. 2d at 1363 (quoting *Def.'s Mem. In Opp'n to Pl.'s and Def.-Intervenors' Mot. for J. Upon Agency R.* ("*Def.'s Br.*") at 16-17). After applying the two-step analysis to Usinor, Commerce concluded it did not have a duty to analyze whether the subsidies passed to Usinor because Usinor was the "same person" before and after the privatization. *Id.* (citing *Def.'s Br.* at 18).

> After a lengthy review and analysis of the remand record, Commerce determined that government-owned Usinor and privatized Usinor were for all intents and purposes the same person. As a result, the prior subsidies remained attributable to privatized Usinor, as all of the elements of a subsidy were established with regard to privatized Usinor. Thus, it was unnecessary for Commerce to proceed to the second step in its privatization analysis, which would have involved an inquiry into whether a subsidy had nevertheless been provided to the privatized entity through the privatization transaction itself. *Commerce, therefore, did not address the issue whether the transaction's purchase price had been fair market value.*

*Id.* at 1363-64 (quoting *Def.'s Br.* at 18). Additionally, Commerce used a 14-year average useful life (AUL) to allocate the benefits bestowed by nonrecurring subsidies. Based upon its findings, Commerce recalculated Usinor's CVD rate to be 7.72% *ad valorem*.

In *Allegheny I,* this court found that Commerce's change in ownership methodology for determining if subsidies passed through to the newly privatized Usinor violated § 1677(5)(F). In accordance with the Federal Circuit's interpretation of 19 U.S.C. § 1677(5) in *Delverde III*, this court held that

> [t]he Federal Circuit in *Delverde* laid out certain criteria that at a minimum any new methodology must include. First, Commerce cannot rely on any *per se* rule. Second, it must look at the facts and circumstances of the TRANSACTION, to determine if the PURCHASER, received a subsidy, directly or indirectly, for

> which it did not PAY ADEQUATE COMPENSATION.  In this instance,
> Commerce avoids examining the terms of the sale by arguing that under the four-
> part test it developed, if the pre- and post-corporation is the same person, it is not
> required to determine if the subsidy it found to exist pre-privatization continues
> post-privatization.  This argument contravenes the Federal Circuit's holding in
> *Delverde III*.
>
> From *Delverde III*,  it is evident that the court interpreted section
> 1677(5)(F) as *requiring* Commerce to determine if the subsidy continued to
> benefit the post-privatized corporation.  In this instance, Commerce has developed
> a methodology that circumvents its statutorily mandated duty to determine if a
> benefit was conferred on the privatized corporation.

*Allegheny I*, 182 F. Supp. 2d at 1366 (emphasis in original).

In *Remand Determination II* ("*Redetermination*"), Commerce begrudgingly attempted to

comply with this court's order.  "[W]hile [Commerce does] not agree with the Court's

interpretation of <u>Delverde III</u>, we have performed the remand, as ordered."  *Remand*

*Determination II* at 4.  Commerce determined that the "overwhelming majority of the purchasers

of Usinor's shares paid the full fair-market value (or more than full value) for those shares and,

therefore, did not receive any countervailable subsidy."  *Id.* (footnote omitted).  However,

Commerce also determined that "Usinor employees who purchased the small percentage of

remaining shares paid less than the full fair-market value of those shares, and thus did receive a

subsidy from the French Government. . . . "  *Id.* at 4.  Despite Commerce's finding that a subsidy

from the French Government was passed through during the privatization of Usinor, it concluded

"this subsidy is not countervailable because these purchasers are distinct individuals who are not,

in their individual capacity, engaged in the production of the subject merchandise."  *Id.* at 5.

Thus, it concluded "the rate of countervailable subsidy for the subject merchandise produced and

sold by Usinor during the period of investigation to be 00.00 percent."  *Id*. at 19.

Plaintiffs raise a number of objections to the Redetermination.  They argue that

Commerce has adopted a new *per se* rule, that "an arm's-length sale at [fair market value] at once precludes finding of new subsidies and eliminates past subsidies, which contravenes both the directives of this court and the Federal Circuit in *Delverde III*. *Domestic Industry's Comments on the Results of Redetermination Pursuant to Court Remand ("Pls.' Remand Br.")* at 3. Plaintiffs contend that if "the corporate entity remain[s] unchanged, then the agency's original finding of financial contribution and benefit should be sufficient to attribute the unallocated portion of these subsidies to Usinor." *Id* at 7. Plaintiffs also argue that Commerce erred by focusing on "fair market value" paid for shares, instead of whether the subsidies were repaid, and that "privatization can extinguish prior subsidies only where purchasers 'compensate' the government seller by paying more than FMV for the company." *Id.* at 7. Plaintiffs, lastly, argue Commerce mistakenly applied its privatization analysis to the sales of stock subsequent to the 1995 initial sale. *Id.* at 8. Plaintiffs contend that the amount of shares sold was too small to "trigger application of the agency's methodology." *Id.*

## III. STANDARD OF REVIEW

The court must evaluate whether the remand findings are supported by substantial evidence on the record or otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B).

## IV. DISCUSSION

In *Remand Determination II*, Commerce analyzed the privatization transaction by "gaug[ing] the reasonableness of the prices set by the [Government of France] and, consequently, whether full value was paid for the company by examining whether the sales process solicited the

maximum number of potential purchasers practicable and whether the share prices set by the [Government of France] were market clearing prices." *Remand Determination II* at 11. Thus, Commerce analyzed whether the sales process was open and competitive and examined the demand levels for Usinor's shares at the prices the Government of France had offered the stock.

Commerce first analyzed the sales process the Government of France used to foster the sale of Usinor's shares:

> The [Government of France's] plan for privatizing Usinor essentially divided potential purchasers of Usinor's shares into four pools: the French public, the international public, Usinor employees and stable shareholders. A certain number of shares were set aside for each group and, generally different prices were charged for each group.

*Id.* at 12. Commerce found that for the French public and international public the sales process was open and competitive. However, "[r]egarding the shares to the employees and stable shareholders, we have determined that the sales processes included restrictions and limitations which reduced the number of investors that might have participated in the share offering" *Id.* at 15.

Commerce next focused on the pricing of Usinor's shares. Commerce determined that "[g]iven the over-subscription at FF 86 price; the fact that shares were moved from the international offering to the French offering; and the number of shares sold at each of the two prices, it appears that the market clearing price for Usinor's shares was between FF 86 and 89." *Id.* at 14. Thus, Commerce concluded that only the employees failed to pay full value for their shares because they were able to purchase shares at FF 68.80. Although it did note there were certain restrictions on these shares it did not attempt to set a market value for the employees' restricted shares. Although Commerce determined that the sale of shares to the stable

shareholders was not open and competitive, Commerce concluded "[r]egarding the shares sold to stable shareholders, the stable shareholders paid a little more than full value for the shares and as such did not receive a benefit from the privatization transaction." *Id.* at 18-19.

Additionally, in subsequent share transactions Commerce did "determine that the sales process for the shares sold by the [Government of France] in the 1997 public offering was open and unrestricted. Moreover, the prices paid for these shares reflected the market price for Usinor's shares. Therefore, we determine that these investors paid full value for these shares." *Id.* at 17.

Commerce has complied with the court's instructions in *Allegheny I* and examined the transaction in detail. It has determined that as a result of the analysis, the CVD rate attributable to GTS should now be 0.00%. The court will affirm this result of remand on the record before it. However, the court is troubled by Commerce's reasoning that although current or former employees of Usinor paid less than full fair-market value for the small percentage of shares they purchased "this subsidy was not countervailable because these purchasers are distinct individuals who are not, in their individual capacity, engaged in the production of the subject merchandise." *Id.* at 5. With this rationale, Commerce became unnecessarily embroiled in the distinction between the corporation (Usinor) that received the original subsidies and the shareholders that purchased Usinor. The court agrees with Plaintiffs that its decision in *Allegheny I* did not intend to "'reject' the long-held principle that subsidies accrue to companies rather than owners." *Pls.' Remand Br.* at 5. In fact, the court was explicit in *Allegheny I*, where Commerce attempted to ignore the role of the purchaser in the privatization, that Commerce must evaluate the transaction "to determine if the subsidy continued to benefit the post-privatized corporation" or determine

that the purchaser paid adequate compensation to the Government of France such that the subsidies were extinguished. *Allegheny I*, 182 F. Supp. 2d at 1366.

Commerce's better approach would have been a further analysis of the transaction to determine any benefit of this supposedly non-countervailable subsidy. However, a remand on this issue is not warranted. Neither Plaintiffs nor Defendant-Intervenors has addressed this issue and the court declines to conclude that Commerce's approach is not in accordance with law on its own initiative in the absence of legal argument from all parties. Plaintiffs ask instead that the court remand "this case so that Commerce may focus on the entity under investigation and the extent to which the identity of the corporate entity may have been affected by the change in ownership." *Pls.' Remand Br.* at 7. This is precisely the inquiry the court held was inadequate in *Allegheny I*, following the Federal Circuit's decision in *Delverde*. The court rejects the contention that focusing on the company justifies the application of the "same-person" test advocated by Commerce and Plaintiffs. The reasons for rejection were fully explicated in *Allegheny I* and need not be repeated here.[3]

Furthermore, although the court agrees that "Commerce must examine the facts of the transaction to determine 'whether the new owners compensated the government for previous

---

[3]In asserting this argument, Plaintiffs cite a recent opinion of this Court *ACCIAI Speciali Terni S.p.A., et al v. United States*, 26 CIT __, 206 F. Supp. 2d 1344 (2002), published after *Allegheny I*, which upheld Commerce's "same person" methodology. There are, however, two other actions, both on remand to Commerce, rejecting Commerce's "same person" methodology. *See ACCIAI Speciali Terni S.p.A. v. United States,* 26 CIT __, 2002 WL 342659 (2002), and *ILVA Lamiere E Tubi S.R.L. v. United States*, 26 CIT __, 196 F. Supp. 2d 1347 (2002). The WTO has also weighed in on this issue in a recent panel decision. *United States -Countervailing Measures Concerning Certain Products From The European Communities*, WT/DS212/r (July 31, 2002). This decision cites *GTS I* for the proposition that Commerce cannot develop methodologies that allow it to avoid analyzing the privatization transaction. *Id.* at 7.79.

subsidies,'" *Pls.' Remand Br.* at 7, quoting *Allegheny I,* 182 F. Supp. 2d at 1367 n.9, the court

rejects the argument that the purchasers must pay more than full fair-market value to repay

subsidies. *Pls.' Remand Br.* at 7.  Plaintiffs fail to recognize that when evaluated concurrent with

the privatization the *value* of a subsidy given by the Government of France may differ

significantly from the actual currency value of the subsidy at the time it was bestowed.  For

instance, if a corporation had a full fair-market value of $100 million at the time of sale and

received a $50 million subsidy, Plaintiffs would require that the new purchasers/owners pay $150

million to extinguish the subsidies.  However, if the corporation invested the $50 million subsidy

in property, plant and equipment that became outdated or unproductive, the value of the

corporation could change significantly.  It could be determined that the full fair market value of

the corporation and the subsidies given prior to and/or during privatization*,* is $125 million.  In

addition to the reasons given in this simplistic example, there are numerous reasons why the full

fair-market value of the corporation, *including the value of subsidies*, is less than the absolute

dollar value of $150 million.  Conversely, there could be conditions where a previous subsidy

could become so valuable that new purchasers/owners would be willing to pay a premium for the

corporation, which could increase the full fair-market value beyond $150 million.  Thus,

Plaintiffs' "absolute value" approach fails to capture the true economic reality that a full fair-

market valuation would consider.

Likewise, Plaintiffs' argument that the stock sales conducted after the 1995 public

offering should not be considered part of the privatization process is not persuasive.  *Pls.'*

*Remand Br.* at 9.  The 1997 and 1998 stock sales were within the entirety of the privatization

process, and, therefore, could have resulted in a sale that was not for full value, because the

overall price paid to the Government of France would have been less than the full value of the company, including any continuing benefit conferred by previous subsidization. Commerce evaluated the sales and determined "that the sales process for the shares sold by the GOF in the 1997 public offering was open and unrestricted. Moreover, the prices paid for the shares reflected the market price for Usinor's shares." *Remand Determination II* at 18-19. Commerce found the shareholders who purchased stock in 1997 and 1998 paid full value, and that the price was paid to France, and, therefore, did not go toward capitalizing Usinor. *Remand Determination II* at 18-19. Commerce was correct, therefore, to analyze these sales as part of the privatization process, and there is substantial evidence that the transaction did not create any new subsidies.

CONCLUSION

Although Commerce's *Remand Determination II* may be flawed, the parties' contentions are resolved. Plaintiffs does not contest *Remand Determination II* presumably because Commerce ultimately found that the rate of countervailable subsidy was 0.00 *per cent*. Furthermore, Defendant supports Commerce's findings and requests that the court sustain its *Remand Determination II* and dismiss this action. The only parties challenging this *Remand Determination* are the Defendant-Intervenors; however, for the reasoned detailed above the court rejects their arguments. Therefore, having adjudicated and resolved the legal issues raised by the parties to this action, for the foregoing reasons, the court holds that the Department's *Final Results of Redetermination Pursuant to Court Remand, Allegheny Ludlum Corp. v. United States*, Court No. 99-09-00566 (CIT January 4, 2002) (May 10, 2002) is sustained. Judgment will be entered accordingly.

Dated: _____            _____
      New York, NY                                      Judith M. Barzilay
                                                    Judge