**ALLEGHENY LUDLUM CORP., Armco, Inc. (now known as AK Steel), The United Steel Workers of America, AFL CIO/CLC, Butler Armco Independent Union, and Zanesville Armco Independent Organization, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellant,**

v.

**Usinor, Ugine S.A., and Uginox Sales Corporation, Defendants–Appellees,**

and

**Usinor Stainless USA, Inc., Defendant.**

**Nos. 03–1189, 03–1248.**

United States Court of Appeals, Federal Circuit.

May 13, 2004.

Kathleen W. Cannon, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellants. With her on the brief were David A. Hartquist and Eric R. McClafferty. Of counsel were John M. Herrmann and Lynn D. Maloney.

John McInerney, Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and David D'Alessandris, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC. Of counsel on the brief were Robert Nielsen and Dean A. Pinkert, Senior Attorneys, Import Administration, United States Department of Commerce, of Washington, DC.

Stephen J. Marzen, Shearman & Sterling LLP, of Washington, DC, argued for defendants-appellees. On the brief were Thomas B. Wilner and Quentin M. Baird. Of counsel were Robert S. LaRussa, Jeffrey M. Winton and Christopher M. Ryan.

Before MICHEL, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

After remand, the United States Court of International Trade affirmed the De-

partment of Commerce's (Commerce's) countervailing duty rate on Usinor's products. *Allegheny Ludlum Corp. v. United States*, 246 F.Supp.2d 1304 (Ct. Int'l Trade 2002) (*Allegheny II*); *Allegheny Ludlum Corp. v. United States*, 182 F.Supp.2d 1357 (Ct. Int'l Trade 2002) (*Allegheny I*). Because the Court of International Trade correctly determined that the same-person methodology for calculating a countervailing duty rate is not in accordance with law, this court affirms.

## I.

In the 1980s, France became the sole owner of Usinor and Salicor, two French steel companies, and placed them under the ownership of a holding company, also called Usinor. In 1993, Commerce determined that certain nonrecurring, debt-relief subsidies to Usinor were countervailable. These subsidies included conversions of loans with special characteristics into equity, conversions of certain bonds into equity, and shareholders' advances. Two years later, France began privatizing Usinor through sales of stock to the French and international public, Usinor employees, and stable shareholders, including investors that were restricted from selling during the privatization process. The privatization was complete by 1998.

In mid–1998, Commerce initiated countervailing duty investigations to determine whether manufacturers of stainless steel sheet and strip were receiving countervailable subsidies in calendar year 1997. Approximately one year later, Commerce issued its final affirmative determination, finding a total estimated net countervailable duty (CVD) of 5.38 percent *ad valorem* for Usinor. *See Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils From France*, 64 Fed.Reg. 30,774 (June 8, 1999). In calculating that countervailable subsidy rate, Commerce used its then-current gamma methodology.

Usinor challenged Commerce's determination before the Court of International Trade, but before that court could render a decision, Commerce requested a remand to examine its methodology in light of *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed.Cir.2000) (*Delverde III*). *Delverde III* invalidated the gamma methodology in view of 19 U.S.C. § 1677(5)(F), enacted to overrule the Court of International Trade's decision in *Saarstahl AG v. United States*, 858 F.Supp. 187 (Ct. Int'l Trade 1994), *rev'd*, 78 F.3d 1539 (Fed.Cir.1996). In *Saarstahl*, the Court of International Trade held that an arm's-length sale extinguished any competitive benefit, thus eliminating any countervailable subsidies. 858 F.Supp. at 194. To the contrary, 19 U.S.C. § 1677(5)(F) provides:

> A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

19 U.S.C. § 1677(5)(F) (2000). Under this section, this court in *Delverde III* examined the sale of the assets of a privately owned pasta producer to a different privately owned pasta producer. The pasta producer that sold its assets had received subsidies from the Italian government. *Delverde III* called upon this court to determine whether the asset sale extinguished the pre-sale subsidies. This court ruled that the statute proscribed a *per se*

application of countervailing duties based on past countervailable subsidies. Instead this court required Commerce to examine the circumstances of the transaction to determine whether the countervailable subsidy survived the transfer. *Delverde III*, 202 F.3d at 1366.

Upon remand after *Delverde III*, Commerce applied a new methodology, designated the same-person methodology, to Usinor's privatization. Using four factors borrowed from general corporate law, the same-person methodology examined the pre- and post-privatization entities in light of: the continuity of general business operations; the continuity of production facilities; the continuity of assets and liabilities; and the retention of personnel. From these four factors, Commerce concluded that the only change to Usinor was the identity of the shareholders. In particular, Commerce determined that post-privatization Usinor was the same corporate person as pre-privatization Usinor and had retained the pre-privatization subsidies. On the basis of this finding, Commerce calculated Usinor's CVD rate to be 7.72 percent *ad valorem*. Usinor appealed to the Court of International Trade.

The Court of International Trade ruled that Commerce's same-person methodology did not comply with *Delverde III* and 19 U.S.C. § 1677(5)(F). Specifically, the trial court observed that Commerce may not create a *per se* rule. The trial court further found that the same-person methodology, in practice, amounts to such an automatic rule and circumvents the requirement to "look at the facts and circumstances of the TRANSACTION, to determine if the PURCHASER, received a subsidy, directly or indirectly, for which it did not PAY ADEQUATE COMPENSATION." *Allegheny I*, 182 F.Supp.2d at 1366 (capitalization original). The trial court further noted:

> From *Delverde III*, it is evident that ... Commerce [must] determine if the subsidy continued to benefit the post-privatized corporation. In this instance, Commerce has developed a methodology that circumvents its statutorily mandated duty to determine if a benefit was conferred on the privatized corporation.

*Id.* Accordingly, the court remanded the case. *Id.* at 1369. In the second remand, Commerce examined the details of the transaction and determined no countervailable subsidies survived the privatization of Usinor. Specifically, Commerce found "the overwhelming majority of the purchasers of Usinor's shares paid full, fair market value (or more than full value) for those shares and, therefore, did not receive any countervailable subsidy." Results of Redetermination Pursuant to Court Remand, *Allegheny Ludlum Corp. v. United States*, CIT No. 99–09–00566, at 4 (June 3, 2002). Thus, Commerce's examination of the details of the Usinor transaction yielded a CVD rate of 0 percent. On further review, the Court of International Trade affirmed. *Allegheny II*, 246 F.Supp.2d 1304.

After this countervailing duty investigation was underway, Commerce, for reasons unrelated to this litigation, abandoned the same-person methodology in favor of a privatization methodology. The current privatization methodology examines the terms and conditions of a change in ownership, including whether the new owners paid fair market value for the privatized business. *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed.Reg. 37,125 (June 23, 2003). Commerce changed its position because the

World Trade Organization (WTO) issued an appellate report stating that the same-person methodology violates § 123 of the Uruguay Round Agreements Act (URAA). *See United States—Countervailing Measures Concerning Certain Products from the European Communities,* WT/DS212/AB/R (Dec. 9, 2002). Commerce's current practice, however, applies only prospectively to countervailing duty investigations initiated after June 30, 2003, or in some cases November 8, 2003. 68 Fed. Reg. at 37,138.

Commerce and the domestic producers (collectively, Allegheny Ludlum) now appeal, arguing that the same-person methodology does not violate either the statute or precedent.

## II.

This court reviews antidumping judgments of the Court of International Trade by applying anew the same statutory standard as that court. *Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1392–93 (Fed.Cir.1997). The relevant statute states that "the Court shall hold unlawful any determination, finding or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1) (2000). This court reviews statutory construction without deference. *Saarstahl, AG v. United States,* 78 F.3d 1539, 1542 (Fed.Cir.1996).

In particular, this court reviews the Court of International Trade's statutory construction under the two-fold procedure of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* this court first examines "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Zenith Elecs. Corp. v. United States,* 77 F.3d 426, 429–30 (Fed.Cir.1996). If, however, the intent of Congress is not clear, this court "defer[s] to the interpretation Commerce has given its own governing statute." *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed.Cir.1996). Because Congress has spoken directly to the issue of whether Commerce may treat sales of stock differently from sales of assets, this court need not defer to Commerce's interpretation.

### A.

■ The parties do not dispute that Usinor received nonrecurring countervailable subsidies before the privatization. Therefore the applicable statutory provision governs the standards for assessing the effect of a change in ownership on the preexisting subsidies. The provision recites:

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

19 U.S.C. § 1677(5)(F). This court has already construed that provision in circumstances quite similar to this case. In *Delverde III,* this court explained:

[Section 1677(5)(F)] clearly states that a subsidy cannot be concluded to have

been extinguished solely by an arm's length change of ownership. However, it is also clear that Congress did not intend the opposite, that a change in ownership *always* requires a determination that a past countervailable subsidy continues to be countervailable, regardless whether the change of ownership is accomplished through an arm's length transaction or not. If that had been Congress's intent, the statute would have so stated. Rather, the Change of Ownership provision simply prohibits a *per se* rule either way.

*Delverde III*, 202 F.3d at 1366 (emphasis original). Accordingly, a change in ownership neither necessarily extinguishes nor necessarily carries over a countervailable subsidy. Instead, this statute requires a fact-intensive inquiry into the circumstances surrounding the transfer of ownership, beyond the simple inquiry into whether the transaction occurred at arm's-length. Moreover, this court further clarified:

> [T]his provision does not direct Commerce to use any particular methodology for determining the existence of a subsidy in a change of ownership situation. Reading this provision together with the previous subsections' clear directions for determining the existence of a subsidy, we conclude that the statute does not contemplate any exception to the requirement that Commerce determine that a government provided both a financial contribution and benefit to a person, either directly or indirectly, by one of the acts enumerated, before charging it with receipt of a subsidy, even when

that person bought corporate assets from another person who was previously subsidized.

*Id.* This court clarified that the statute requires Commerce to determine that the purchaser "received both a financial contribution and benefit from a government, albeit indirectly through the seller, before concluding that the purchaser was subsidized." *Id.* at 1367. Based on this reasoning, this court invalidated Commerce's prior gamma methodology. Under that methodology, Commerce presumed "that the subsidies granted to the former owner ... automatically 'passed through' to Delverde following the sale." *Id.* at 1364. Moreover, pertinent to the present case, *Delverde III* explained: "Commerce deemed the fact that Delverde bought the assets, as agreed to by both parties, at fair market value to be *irrelevant* to the determination whether it received a subsidy. It did not consider *any* of the facts or circumstances of the sale relevant." *Id.* at 1367 (emphases original). Because Commerce did not consider all facts and circumstances, including whether adequate remuneration had changed hands during the transaction, this court held that Commerce's methodology violated the statutory scheme. *Id.* at 1369–70.

This case evinces a factual difference from *Delverde III* that does not reflect any legal significance. In *Delverde III*, Delverde, a private company, purchased corporate assets, including a pasta manufacturing facility, name, and trademark, from a private company that had received past countervailable subsidies from Italy.* *Id.* at 1362. In this case, France owned Usi-

---

* Although not relevant to this court's decision in *Delverde III*, Commerce learned upon remand that the Delverde transaction was not, in fact, a sale of assets. Rather, the transac-

tion—like the transaction in this case—comprised a sale of shares for an entire pasta operation. Brief for Defendant–Appellant at

nor (and provided nonrecurring countervailable subsidies to the company), then transferred ownership to private individuals and entities through the sale of ownership shares in the private Usinor corporation. Commerce contends that the form of the transaction—assets versus stock—permits this court to distinguish *Delverde III.* Specifically, Commerce argues that the subsidy creates a financial liability that belongs to and resides in the corporation itself, not the owners of the corporation. Thus, according to Commerce, the transfer of ownership through sales of stock could not extinguish liability for past countervailable subsidies. Thus, as in the *Delverde III* case, Commerce argues that purchases at fair market value are irrelevant to the receipt of prior subsidies. To the contrary, in addition to *Delverde III,* this court has repeatedly approved consideration of fair market value in assessing countervailing duties in privatization transactions, albeit under an earlier version of this particular statute. *See Inland Steel Bar Co. v. United States,* 155 F.3d 1370, 1374 (Fed.Cir.1998); *Saarstahl,* 78 F.3d at 1544. Moreover, this court's interpretation of § 1677(5) avoids unnecessary conflict between domestic law and the international obligations of this country. *See Murray v. Charming Betsy,* 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804).

This court's most important reason, however, for refusing Commerce's invitation to treat transfers of ownership through sales of stock differently than through sales of assets is the statute. First and foremost, the statute expressly requires the evaluation of sales of assets and sales of stock on equivalent terms. Indeed, the statutory language mentions them in the alternative: "A change in own-

ership of all or part of a foreign enterprise *or* the productive assets of a foreign enterprise." 19 U.S.C. § 1677(5)(F) (emphasis added). The first category refers to a sale of stock; the second refers to a sale of assets. The disjunctive between the first and second indicates that the law does not permit Commerce to treat a change of ownership differently based on the form of the transaction. After requiring equivalent treatment of these forms of ownership changes, the statute proceeds to proscribe any automatic assessment that these transfers necessarily extinguish countervailable subsidies (even where the transaction occurred at arm's-length). This statutory language, however, equates transfers of ownership irrespective of the transaction's form and impeaches Commerce's attempt to make a distinction.

■ The legislative history of this section confirms that the language does not permit a distinction between stock sales and asset sales. The House Report states:

Section [1677(5)(F)] provides that a change in the ownership of "all or part of a foreign enterprise" (i.e., a firm or a division of a firm) or the productive assets of a firm, even if accomplished through an arms-length transaction, does not by itself require Commerce to find that past countervailable subsidies received by the firm no longer continue to be countervailable.

. . . .

The issue of the privatization of a state-owned firm can be extremely complex and multifaceted. While it is the Committee's intent that Commerce retain the discretion to determine whether, and to what extent, the privatization of a government-owned firm eliminates any

20 n. 6; Brief for Defendants–Appellees at 17    n. 34.

previously conferred countervailable subsidies, Commerce must exercise this discretion carefully through its consideration of the facts of each case and its determination of the appropriate methodology to be applied.

H.R.Rep. No. 103–826, part I, at 110 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3882. The Senate Report echoes the same fact-intensive approach that Commerce should employ when examining a change in ownership in light of countervailing duties:

> [A] change in the ownership of all or part of a foreign enterprise (i.e., a firm or a division of a firm) or its productive assets does not by itself require the Commerce Department to determine that a countervailable subsidy received by the firm prior to the change in ownership no longer continues to be countervailable, even if the change in ownership occurs through an "arms length transaction" (defined as a transaction negotiated between unrelated parties, each acting in its own interest, or between related parties such that the terms of the transaction are those that would exist if the transaction had been negotiated between unrelated parties).
>
> . . . .
>
> The Commerce Department should continue to have the discretion to determine whether, and to what extent (if any), actions such as the "privatization" of a government-owned company actually serve to eliminate such subsidies. It is the Committee's expectation that Commerce will exercise this discretion carefully and make its determination based on the facts of each case, developing a methodology consistent with the principles of the countervailing duty statute.

S.Rep. No. 103–412, at 92 (1994). Thus, the House Report and the Senate Report both reiterate that Commerce must treat different forms of ownership change equivalently and both encourage careful consideration of all the facts of every case in the context of the complex issue of privatization.

These reports highlight another deficiency of Commerce's same-person methodology. In seeking any benefit that the purchaser might have indirectly received from the prior subsidies, that methodology refused to consider that the state (in this case, France) may have received full remuneration for the subsidy. In other words, Commerce refused to inquire whether the privatization transaction fully repaid the subsidy to the state. Indeed, when Commerce did check the particulars of the transaction upon remand, it determined that the new owners had paid full market value or more for Usinor and thus extinguished the subsidy. Once Commerce determined, however, that post-privatization Usinor fit within the same-person test, that same-person methodology precluded consideration of all the particulars of the transactions and instead unnecessarily limited the assessment to non-market factors such as the identity of the pre- and post-privatization facilities and personnel. These limited inquiries do not directly address the economic indicators of the repayment of a past subsidy. In any event, the language of the statute, as interpreted by *Delverde III*, required Commerce to treat stock and asset sales equivalently and to make the "specific findings of financial contribution and a benefit to [the purchaser] that are required by §§ 1677(5)(D) and (E)." *Delverde III*, 202 F.3d at 1367. The Court of International Trade correctly discerned that Commerce's initial methodology did not satisfy either of those requirements.

On another point, the trial court correctly ruled that *Delverde III* governs this

case. *Delverde III* set forth three specific requirements of the statute, namely that Commerce must examine all facts and circumstances, including the terms of the transaction; that Commerce must determine whether the purchaser directly or indirectly received a countervailable subsidy; and that Commerce must not apply a *per se* rule. These principles apply even if the change of ownership occurs by a sale of assets rather than stock. Nevertheless, *Delverde III* recognizes different concerns between privatization and private-to-private sales: "Unlike a private seller who seeks the highest market price for its assets, the government may have other goals, such as employment, national defense, and political concerns, which may affect the terms of a privatization transaction." 202 F.3d at 1369. But an examination of all facts and circumstances, including whether the sales of shares occur at arm's-length and for fair market value, subsumes these concerns. Accordingly, *Delverde III* applies faithfully the language of the statute that treats equivalently sales of assets and sales of stock.

Finally, the trial court also correctly discerned that a distinction between a transfer of ownership involving stock and assets would elevate form over substance. The economic forms of a change of ownership are often interchangeable. Buyers and sellers could easily structure asset sales as stock sales or vice versa. Cf. *Inland Steel*, 155 F.3d at 1374–75 (noting a "potential for circumvention of countervailing duties" if sales of stock and sales of assets are treated disparately). In this case, for example, France could have sold the entirety of Usinor's assets to a private company, including all facilities, personnel, know-how, etc. Under *Delverde III*, Commerce would then have had to examine the entirety of the transaction, including whether the private company paid fair market value for those assets. Because the same substantive transfer occurred in a different form, namely a sale of stock, Commerce should not refuse to do the same thorough analysis of the economic underpinnings of the transaction. If this court permitted a distinction between transfers of assets and transfers of stock in the context of countervailing duties (that the statute does not allow), this non-statutory rule would irrationally and artificially encourage one form of transfer over another.

Lastly, although the same-person methodology masquerades as a test with factual components, the trial court correctly perceived that it is a *per se* rule for all practical intents and purposes, completely ignoring the complexity inherent in a privatization. Without regard to the specifics of the privatization, the same-person methodology merely determines whether the pre-privatization and post-privatization entity is the same corporate person. To be sure, four factors govern this determination, including the continuity of general business operations, the continuity of production facilities, the continuity of assets and liabilities, and the retention of personnel. But should Commerce determine that the same person survived the privatization, the liability for the countervailing duty prior to privatization would automatically and necessarily carry over to the post-privatization entity without regard to all relevant facts and circumstances. For instance, the same-person methodology would never consider whether the purchasers adequately compensated the seller (i.e., the foreign government) for the entirety of the acquired business and thus repaid any past subsidies. This facile determination is therefore a *per se* rule in disguise. *Delverde III* expressly prohibits such an abbreviated approach in examin-

ing the totality of the economic circumstances to determine whether the pre-privatization countervailable subsidy carries over post-privatization. 202 F.3d at 1366.

The trial court correctly grounded its judgment in the statute and this court's precedent of *Delverde III*. Another consideration also supports the trial court's analysis. Section 1677(5)(F) "must be interpreted to be consistent with [international] obligations, absent contrary indications in the statutory language or its legislative history." *Luigi Bormioli Corp. v. United States,* 304 F.3d 1362, 1368 (Fed.Cir.2002); *see also Fed. Mogul Corp. v. United States,* 63 F.3d 1572, 1581 (Fed.Cir.1995). This two-century-old canon of construction originated with *Murray v. Charming Betsy,* where the Supreme Court explained:

> It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

6 U.S. (2 Cranch) at 118, 2 L.Ed. 208. The *Charming Betsy* doctrine further supports the statutory principle that treats sales of stock and sales of assets identically for the assessment of countervailing duties. In this case, disparate treatment under the same-person methodology would contravene the international obligations of the United States. As noted earlier, the WTO issued an appellate report stating that the same-person methodology violates § 123 of the URAA. The WTO specifically rejected the argument that sales of assets should be treated differently from sales of stock for assessing countervailing duties. *See United States—Countervailing Measures Concerning Certain Products from the European Communities,* WT/DS212/AB/R. Accordingly, where neither the statute nor the legislative history supports the same-person methodology under domestic countervailing duty law, this court finds additional support for construing 19 U.S.C. § 1677(5)(F) as consistent with the determination of the WTO appellate panel. In so doing, this court recognizes that the *Charming Betsy* doctrine is only a guide; the WTO's appellate report does not bind this court in construing domestic countervailing duty law. Nonetheless, this guideline supports the trial court's judgment.

### B.

Anticipating that this court would reject the same-person methodology under the statute and case law, Allegheny Ludlum argues in the alternative that the Court of International Trade remand order improperly focused on whether the sale of stock was at arm's-length and for fair market value. *See Allegheny I,* 182 F.Supp.2d at 1368–69. In particular, Allegheny Ludlum focuses on the words of the statute, particularly the specific reference to an arm's-length transaction without a concomitant reference to fair market value. Allegheny Ludlum further argues that arm's-length transactions necessarily occur at fair market value.

■ This argument conflates two very separate and distinct concepts: the relationship between the transacting parties and the value exchanged during the transaction. An authoritative legal dictionary defines "arm's-length" as "[o]f or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential transaction." *Black's Law Dictionary* 103

(7th ed.1999). The same dictionary defines "value" as "[t]he monetary worth or price of something; the amount of goods, services, or money that something will command in an exchange." *Id.* at 1549. The dictionary further defines "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Id.* Accordingly, a transaction may occur at arm's-length without also involving fair market value. Thus, the remand order, which instructed Commerce to examine the particulars of the privatization including fair market value, is not inconsistent with *Delverde III* and § 1677(5)(F).

### III.

While rejecting Commerce's same-person methodology, this court refrains from endorsing Commerce's methodology used on remand after *Allegheny I.* On remand, Commerce noted that, in its decision in *Allegheny I,* the Court of International Trade had cited the fact that Usinor's privatization had involved two public offerings at different prices and that there had been an employee offering and a sale of certain stock to "stable shareholders" at a two percent premium over the international offering price. Results of Redetermination Pursuant to Court Remand, *Allegheny Ludlum Corp. v. United States,* CIT No. 99–09–00566, at 4 (June 3, 2002). Accordingly, Commerce proceeded to analyze "the facts and circumstances of Usinor's privatization to determine whether the purchasers (*i.e.,* the new owners) paid full value for the company." *Id.* Based upon its analysis, Commerce determined that "the overwhelming majority of the purchasers of Usinor paid the full fair-market

value (or more than full value) for [their] shares and, therefore, did not receive any countervailable subsidy." *Id.* (footnote omitted). Commerce thus concluded that Usinor's prior subsidy had been eliminated. *Id.* at 19. In its remand determination, however, Commerce stated:

> We note that whether a benefit is bestowed on a purchaser in the privatization transaction is not relevant to the benefits previously bestowed upon the pre-privatization company. While we might otherwise conclude that this means the benefits of subsidies previously bestowed upon the company sold were unaffected by the transaction, our understanding of the Court's decision is that we are not free to reach that conclusion. To reach such a conclusion, we would have to ignore the Court's order stating that *Delverde III* and the statute require the Department to focus on the benefit to the purchaser of the company, not to the company itself. As discussed below, because in this case, the purchaser/new owners are not the company, any previous benefit to the company cannot be ascribed to the purchasers/new owners and any benefit to the purchasers/new owners cannot be ascribed to the company. As a result, under an analysis which focuses on the benefit to the purchasers/new owners, any prior subsidies become irrelevant because they cannot be ascribed to the purchasers/new owners and are thus no longer countervailable under the Court's interpretation of the statute and *Delverde III.*

*Id.* at 4 n. 2. Believing itself thus constrained, Commerce determined that the countervailing duty rate was 0 percent.

Upon review of that determination, the Court of International Trade affirmed that

rate on the record before it. *Allegheny II,* 246 F.Supp.2d at 1309. Nevertheless, the court expressed some concerns about Commerce's reasoning, stating that "Commerce became unnecessarily embroiled in the distinction between the corporation (Usinor) that received the original subsidies and the shareholders that purchased Usinor." *Id.* Indeed, the court rightly observed that its prior decision "did not intend to reject the long-held principle that subsidies accrue to companies rather than owners." *Id.* Simply put, Commerce's remand determination in light of *Allegheny I* appears to have substituted one inadequate methodology for a second inadequate methodology not taking into account the full and complete analysis under *Delverde III* requiring an evaluation of whether the post-privatized entity continues to enjoy the pre-privatization subsidies.

In this respect, this court agrees with the trial court, which explained:

> Commerce's better approach would have been a further analysis of the transaction to determine any benefit of this supposedly non-countervailable subsidy. However, a remand on this issue is not warranted. Neither [Allegheny Ludlum] nor [Usinor] has addressed this issue and the court declines to conclude that Commerce's approach is not in accordance with law on its own initiative in the absence of legal argument from all parties.

*Allegheny II,* 246 F.Supp.2d at 1309–10. Similarly, no party argues to this court that the remand analysis of Commerce was inadequate under *Delverde III*. Although, like the Court of International Trade, this court does not endorse Commerce's remand analysis after *Allegheny I*, absent argument from any party, this court will not disturb it. *See Johns Hopkins Univ.*

*v. CellPro, Inc.,* 152 F.3d 1342, 1362 (Fed. Cir.1998) ("As a general rule, an appellate court will not hear on appeal issues that were not clearly raised in the proceedings below.").

## IV.

Because the Court of International Trade did not err in ruling that Commerce may not employ the same-person methodology in calculating countervailing duties, this court affirms.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*