SLIP OP. 04-140

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
                                        :
ACCIAI SPECIALI TERNI S.p.A. and        :
ACCIAI SPECIALI TERNI USA,              :
                                        :
            Plaintiffs,                 :
                                        :
                                        :    Before: WALLACH, Judge
       v.                               :    Court No.: 99-06-00364
                                        :
UNITED STATES,                          :
                                        :
            Defendant,                  :    **PUBLIC VERSION**
                                        :
       and                              :
                                        :
ALLEGHENY LUDLUM CORP., et al.,         :
                                        :
            Defendant-Intervenors.      :
                                        :
———————————————————————

[Defendant's Remand Determination remanded for further investigation.]

                                        Decided: November 12, 2004

Hogan & Hartson L.L.P. (Lewis E. Leibowitz, Richard L.A. Weiner, Lynn G. Kamarck, H. Deen Kaplan), for Plaintiffs.

Robert D. McCallum, Assistant Attorney General; David M. Cohen, Director; Lucius B. Lau, Assistant Director; Brent McBurney, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Robert E. Nielsen, Senior Attorney; John McInerney, Chief Counsel, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant United States.

Collier Shannon Scott, PLLC (David A. Hartquist, Paul C. Rosenthal, Kathleen W. Cannon, Lynn D. Maloney, Eric R. McClafferty), for Defendant-Intervenors.

## OPINION

**WALLACH, Judge.**

## I
## INTRODUCTION

This matter is before the Court following the issuance of the United States Department of Commerce's ("Commerce") <u>Results of Redetermination Pursuant to Court Remand, Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA v. United States</u>, Court No. 99-06-00364 (June 3, 2002) ("Redetermination").  Plaintiffs challenge Commerce's finding that the 1994 sale of Acciai Speciali Terni S.p.A. ("AST") to private parties extinguished subsidies received from the Government of Italy ("GOI") prior to the sale.  Commerce claims that it reached this result following the court's remand instructions in <u>Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA v. United States</u> ("<u>Acciai I</u>"), Slip Op. 02-10, 2002 Ct. Int'l Trade Lexis 25 (Feb. 1, 2002).  In <u>Acciai I</u>, this Court reviewed the <u>Final Results of Redetermination Pursuant to Court Remand, Acciai Speciali Terni S.p.A.  v. United States</u> (2001) ("Remand Determination"), in which Plaintiffs' challenged the voluntary remand of Commerce's decision in <u>Final Affirmative Duty Determination; Stainless Steel Plate in Coils in Italy</u>, 64 Fed. Reg. 15,508 (1999) ("Final Determination").

The court finds that Commerce failed to abide by and misinterpreted the court's remand instructions in <u>Acciai I</u> and thus finds invalid Commerce's Redetermination.  This court has jurisdiction pursuant to 19 U.S.C. § 1581(c) (2004).

## II
## BACKGROUND

On March 31, 1998, Allegheny Ludlum Corp., et al., ("Allegheny"), the Defendant-Intervenors, filed a countervailing duty petition with Commerce arguing that AST, a privatized corporation, continued to benefit from subsidies bestowed upon its predecessors from the GOI. See Initiation of Countervailing Duty Investigations: Stainless Steel Plate in Coils From Belgium, Italy, the Republic of Korea and the Republic of South Africa, 63 Fed. Reg. 23,272 (April 28, 1998) ("Initiation Notice"). On March 31, 1999, Commerce published its Final Determination, 64 Fed. Reg. 15,508 (March 31, 1999). After the United States International Trade Commission ("ITC") made an affirmative injury determination, see Investigations Nos. 701-TA-376, 377, and 379 (Final) and Investigations Nos. 731-TA-788-793 (Final); Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, 64 Fed. Reg. 25,515 (May 12, 1999), Commerce issued a countervailing duty ("CVD") order[1] for stainless steel plate from Italy. See Notice of Amended Final Determinations: Stainless Steel Plate in Coils from Belgium and South Africa; and Notice of Countervailing Duty Orders: Stainless Steel Plate in Coils from Belgium, Italy and South Africa, 64 Fed. Reg. 25,288 (May 11, 1999).

Commerce based its CVD determination on a *per se* test under which any subsidy and benefit conferred on an entity "passed through" regardless of any sale or change in ownership of

---

[1] CVDs are imposed, pursuant to 19 U.S.C. § 1671(a)(1), when

> (1) the administering authority determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States . . . .

that entity.  Under the *per se* test, an arm's length sale was irrelevant in determining the existence of a "benefit," pursuant to 19 U.S.C. § 1677(5)(B) (1999).[2]

On February 2, 2000, the Federal Circuit ruled in Delverde, SRL v. United States, 202 F.3d 1360, 1364 (Fed. Cir. 2000) ("Delverde III"), that Commerce could no longer rely upon its *per se* methodology. See also Allegheny Ludlum Corp. v. United States ("Allegheny II"), 367 F. 3d 1339, 1341-42 (Fed. Cir. 2004).  At issue in Delverde III was the Tariff Act's definition of a subsidy in 19 U.S.C. §1677(5)(B).  The Federal Circuit concluded that

> the Tariff Act as amended did not allow Commerce to presume that subsidies granted to the former owner of Delverde's corporate assets automatically 'passed through' to Delverde following the sale.  Rather, the Tariff Act required that Commerce make a determination by examining the facts and circumstances of

---

[2] The following description of a subsidy is provided in 19 U.S.C. § 1677(5)(B):

(5) Countervailable Subsidy

. . .

(B) Subsidy described

A subsidy is described in this paragraph in the case in which an authority--

> (i) provides a financial contribution,
>
> (ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or
>
> (iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments

to a person and a benefit is thereby conferred.  For purposes of this paragraph. . ., the term "authority" means a government of a country or any public entity within the territory of the country.

4

sale and then determining whether Delverde directly or indirectly received both a financial contribution and benefit from the government.

Delverde III, 202 F.3d at 1364. Delverde III set out three requirements: (1) that Commerce examine all the facts and circumstances, including the terms of the transaction; (2) that it must determine whether the purchaser directly or indirectly received a countervailable subsidy; and (3) that Commerce could not apply a *per se* rule. See also Allegheny II, 367 F. 3d at 1347.

On August 14, 2000, pursuant to the Government's Motion for Voluntary Remand, this court ordered Commerce to issue a determination in this matter in accordance with the Federal Circuit's decision in Delverde III.[3] On December 19, 2000, Commerce issued its Remand Determination in which it announced it had formulated a new "same person" test[4] to replace the *per se* rule for its contribution and benefit analysis. Commerce argued that, where the pre-sale entity and the post-sale entity are the "same person," as opposed to "distinct persons," further investigation was unnecessary because the contribution and benefit conferred on the former flow to the latter. Commerce thus reaffirmed the conclusion in its Final Determination that KAI Italia S.r.L. ("KAI")-owned AST benefitted from prior subsidies.

On February 1, 2002, in Acciai I, this court remanded the case for further investigation by Commerce. The court held that a subsidy contribution may travel when a government owned

---

[3] The court's Order, dated August 14, 2000, provided "that the investigation at issue in this action, Final Affirmative Countervailing Duty Determination: Stainless Steel Plate in Coils from Italy, 64 Fed. Reg. 15508 (Mar. 31, 1999) was remanded to Commerce to issue a determination consistent with United States law, interpreted pursuant to all relevant authority, including the decision of the Court of Appeals for the Federal Circuit in Delverde, SRL v. United States, 202 F.2d 1360 (Fed. Cir. 2000) . . . ."

[4] Commerce's same person test consists of four prongs, (1) continuity of general business operations, (2) continuity of production facilities, (3) continuity of assets and liabilities, and (4) retention of personnel.

5

entity is privatized. That finding alone, however, does not establish that the associated benefit continues, as defined in the statute. Although Commerce properly applied the "same person" test in Acciai I to determine whether the pre- and post-sale AST were the same person for legal purposes, the test itself was yet another *per se* rule prohibited under the rationale in Delverde III and unsupported by substantial evidence. The Court held that Commerce had to demonstrate the existence and extent of the benefit that GOI-AST had conferred on KAI-AST. Familiarity with the decision in Acciai I is presumed.

On June 3, 2002, Commerce issued its Redetermination replacing its "same person" test with a "full value" test[5] in which it determined that if KAI paid "full value" for AST the original benefit was extinguished and thereby not countervailable. Although Commerce examined the purchase process of AST and found a number of circumstances surrounding the sale might raise questions whether fair market value was actually paid, upon examining the price KAI paid for AST alongside the market valuations of the company, Commerce determined that full value was paid. Thus, Commerce concluded that the original subsidy ceased to be countervailable as a result of the privatization transaction and imposed a countervailing duty rate of 1.62 percent *ad valorem*. Commerce's treatment of the "full value" sale as *per se* determinative of the extinguishment of the countervailable subsidy is the primary focus of this litigation.

---

[5] Commerce claims that the court requested it to "determine whether the price paid by KAI for the shares of AST constituted 'full value' for AST, and to find that, to the extent that KAI paid 'full value' (and so did not receive new benefit from the transaction) the original benefit to AST was not longer countervailable." Redetermination at 4. Thus, it appears that Commerce believed it was ordered by the court in Acciai I to apply a "full value" test.

### III
### STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000). The Court must determine whether the evidence and reasonable inferences from the record support Commerce's finding. Dae Woo Elecs. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993); Timken Co. v. United States, 25 CIT 939, 941 (2001). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

### IV
### DISCUSSION
### A
**The *Per Se* "Full Value" Test for Determining Whether a Subsidy Has Been Extinguished Is Not in Accordance with Delverde III or Allegheny II**

Allegheny argues that Commerce has formulated a *per se* rule in contravention of Delverde III that subsidies are extinguished through change in ownership: Commerce determined that because the buyers of AST paid fair market value ("FMV"), the effect of the subsidies was severed. Redetermination at 15; Comments of the Domestic Industry in Response to the Second Redetermination Issued by the Department of Commerce ("Allegheny's 7-25 Remand

7

Comments") at 2-3. In arguing that Commerce did not comply with Acciai I, Allegheny points to the court's statement that "the purchase price of a public entity's assets at fair market value is not dispositive of a benefit determination . . . ." Redetermination at 15 (quoting Acciai I, Slip Op. 02-10 at 42); Allegheny's 7-25 Remand Comments at 3. Thus, Allegheny contends that Commerce should revise its methodology so as not to make the arm's length, FMV sale determinative of the extinguishment of a subsidy.

Conversely, Plaintiffs argue that Commerce complied with the court's instructions "to consider certain material facts as part of its analysis, including but not limited to the impact the purchase price paid by KAI for AST's assets has upon whatever benefit KAI-AST may have enjoyed." Redetermination at 16 (citing Acciai I, Slip Op. 02-10 at 54); see also Plaintiffs' Comments on Department of Commerce Remand Redetermination ("Plaintiffs' 7-25 Remand Comments") at 2. Plaintiffs claim that Commerce complied with the court's instructions in Acciai I by focusing on whether the buyers paid full value for the company.

Commerce claims that because the court essentially found the "same person" test to be a *per se* test prohibited by Delverde III, the court ordered Commerce to "'examine and consider certain material facts as part of its analysis, including but not limited to the impact of the purchase price paid by KAI for AST's assets has upon whatever benefit KAI-AST may have enjoyed.'" Redetermination at 17 (citing Acciai I, Slip Op. 02-10 at 54). Commerce asserts that it abided by the court's instructions and "analyzed the facts and circumstances of the transaction, including the purchase price and other record evidence regarding the value of AST at the time it was sold, to determine whether the buyers i.e., the new owners received a benefit as a result of the privatization of AST." Id. at 17.

8

Because Commerce determined that the "buyers of AST (KAI) paid full value for the shares of the company," it then found that "'the original subsidy to AST ceased to be countervailable.'"[6] Defendant's Response to Plaintiffs' and Defendant-Intervenors' Comments Concerning the Second Remand Determination Issued by the United States Department of Commerce ("Defendant's Response") at 4 (citing Redetermination at 14-15). Commerce also disputes Allegheny's assertion that it applied a *per se* rule because it claims "if we had found that KAI had paid less than fair market value, we believe that we could have been free under the Court's order to find that not all of the original subsidies to AST were extinguished." Redetermination at 17; see also Defendant's Response at 8.

In the Redetermination, Commerce has formulated a new methodology, the "full value" test, which deems an arms-length, FMV transaction as *per se* extinguishing the original subsidy granted to AST by the GOI. As this court stated in Acciai I, "the Federal Circuit appears to have been concerned about *any* per se assumption regarding the presence of a contribution and a benefit following a change in ownership . . . ." Slip. Op. 02-10 at 30 (emphasis in original). In a key passage, Delverde III discusses 19 U.S.C. § 1677(5)(F) Change in Ownership[7]:

---

[6] Defendant as well as the Defendant-Intervenors argue that Delverde III's holding regarding a prohibition on a *per se* test in the change in ownership analysis only applies to the sale of assets due to the facts of that case. In Allegheny II, however, the Federal Circuit rejected Commerce's argument that Delverde III did not apply to sale of stock. The court stated that the language of 19 U.S.C. § 1677(5), as interpreted by Delverde III, required Commerce to treat stock and asset sales equivalently. Allegheny II, 367 F.3d at 1347.

[7] Pursuant to 19 U.S.C. § 1677(5)(F) Change of Ownership,

> A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by an administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change of ownership is accomplished through an arm's length transaction.

9

This provision clearly states that a subsidy cannot be concluded to have been extinguished solely by an arm's length change of ownership. However, it is also clear that Congress did not intend the opposite, that a change in ownership always requires a determination that a past countervailable subsidy continues to be countervailable, regardless whether the change of ownership is accomplished through an arm's length transaction or not. If that had been Congress's intent, the statute would have so stated. Rather, the Change of Ownership provision simply prohibits a per se rule either way. Furthermore, this provision does not direct Commerce to use any particular methodology for determining the existence of a subsidy in a change of ownership situation. Reading this provision together with the previous subsections' clear directions for determining the existence of a subsidy, we conclude that the statute does not contemplate any exception to the requirement that Commerce determine that a government provided both a financial contribution and benefit to a person, either directly or indirectly, by one of the acts enumerated, before charging it with receipt of a subsidy, even when that person bought corporate assets from another person who was previously subsidized. In other words, the Change of Ownership provision does not change the meaning of "subsidy." A subsidy can only be determined by finding that a person received a "financial contribution" and a "benefit" by one of the acts enumerated in §§ 1677(5)(D) and (E)[8].

---

[8] Pursuant to 19 U.S.C. § 1677(5)(D) and (E),

(D) Financial contribution

The term "financial contribution" means--

(i) the direct transfer of funds, such as grants, loans, and equity infusion, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii) foregoing or not collecting revenues that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii) providing goods or services, other than general infrastructure, or

(iv) purchasing goods.

(E) Benefit conferred

A benefit shall normally be treated as conferred where there is a benefit to the recipient, including--

(i) in the case of equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the

10

<u>Delverde III</u>, 202 F. 3d at 1366. Prohibition of a *per se* rule, assuming that a change in ownership either necessarily extinguishes or carries over a countervailable subsidy, was reiterated in <u>Allegheny II</u>, 367 F.3d at 1344. The Federal Circuit noted that the "statute[19 U.S.C. § 1677(5)(F)] requires a fact-intensive inquiry into the circumstances surrounding the transfer of ownership, beyond the simple inquiry into whether the transaction occurred at arm's-length." <u>Allegheny II</u>, 367 F. 3d at 1344.

Although Commerce claims it has not formulated a *per se* rule with respect to the paying of FMV, Commerce apparently found determinative the existence of a countervailable subsidy as the basis of whether or not there was a FMV sale. Commerce claims that it believed

> that the court intended the Department to determine whether the price paid by KAI for the shares of AST constituted "full value" for AST, and to find that, to the extent that KAI paid "full value" (and so did not receive a new benefit from the transaction) the original benefit to AST was no longer countervailable . . . .

---

> practice regarding the provision of risk capital, in the country in which the equity infusion is made,
>
> (ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on a market,
>
> (iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and
>
> (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

11

> . . . In sum, we conclude that KAI paid at least fair market value for the shares of AST. Under the Court's reasoning as we understand it, we are, therefore, directed to find that the original subsidies to AST are no longer countervailable.

Redetermination at 4 (citing Acciai I, Slip Op. 02-10 at 41-43). Commerce, however, erroneously derived its conclusion from the court's discussion of the importance of a Commerce finding that FMV had been paid during the sale of AST in which the court concluded: "[a]lthough the court recognizes that the purchase of a public entity's assets at fair market value is not dispositive of a benefit determination under the statute, the fact must be fairly considered in arriving at that determination." Acciai I, Slip Op. 02-10 at 43 (emphasis added). Further evidence that Commerce used a *per se* FMV test is its statement that had it found KAI had paid less than FMV, it would not have found that all the benefit from the subsidies had been extinguished.[9] Redetermination at 17.

Commerce's *per se* FMV test *prima facie* fails to comply with the law because, as previously considered by this court, "it misses the mark and 'the fundamental issue whether any such alleged "successor" actually received a market benefit during the period of review with regard to the products under investigation.'" Acciai I, Slip Op. 02-10 at 42. By arguing that payment of FMV *per se* indicates the extinguishment of a subsidy and its benefits, Commerce again "appears to have substituted one inadequate methodology for a second inadequate methodology not taking into account the full and complete analysis under Delverde III requiring an evaluation of whether the post-privatized entity continues to enjoy the pre-privatization subsidies." Allegheny II, 367 F.3d at 1350.

---

[9] "If we had found that KAI had paid less than fair market value, we believe that we could have been free under the Court's order to find that not all of the original subsidies to AST were extinguished." Redetermination at 17.

12

The Federal Circuit in <u>Delverde III</u> stated that 19 U.S.C. § 1677(5) as a whole "clearly requires that in order to find that a person received a subsidy, Commerce determine that that person received from a government both a *financial contribution* and *benefit*, either directly or indirectly . . . " and the determination should hinge on the "*particular facts* and *circumstances* of the sale." 202 F.3d at 1364, 1366 (emphasis added). In other words, <u>Delverde III</u> unequivocally rejects the use of a *per se* rule by Commerce to arrive at its determination and requires a fact specific, case-by-case inquiry.

Clearly 19 U.S.C. § 1677(5) does not require Commerce to use any particular methodology in finding if a countervailable subsidy exists where there is a change in ownership. <u>See Delverde III</u>, 202 F.3d at 1366. Indeed, Commerce's factual findings regarding the FMV nature of the sale in this case are supported by substantial evidence since it adequately considered the facts and circumstances of the privatization sale. It may be that the existence of an FMV sale translates into the extinguishment of a subsidy – as the term "FMV" itself assumes that the sale price would include and take into account subsidies given and benefit conferred. This determination, however, cannot be put forward by Commerce as a *per se* test. Commerce should instead employ a methodology which explains, upon consideration of the factual aspects of the sale, whether the FMV transaction extinguished the subsidy as well as the benefit conferred. In its analysis, Commerce should articulate under what conditions an FMV sale definitively demonstrates that a benefit has been extinguished. This court remands this issue to Commerce so that it can revise its methodology to conform to the requirements of 19 U.S.C. § 1677(5) and explain its reasoning using the case-specific inquiry required under <u>Delverde III</u> and <u>Allegheny II</u>.

13

**B**
**The "Same Person" Test Is Not in Accordance with the Law**

Allegheny reads <u>Acciai I</u> to support the continued use of the "same person" test in evaluating the continuity of a subsidy with some modifications. Defendant-Intervenors' 4-30-02 Comments on Second Remand Redetermination ("Allegheny's 4-30 Comments") at 2-3; Allegheny's 7-25 Remand Comments at 4. It argues that Commerce unduly eliminated the "same person" test from its analysis because the Court had found fault with Commerce's insufficient application of the test rather than with the test itself. Commerce, Allegheny claims, should have more closely considered the nature of the potential benefit enjoyed by the privatized AST by considering "certain mitigating factors." Redetermination at 17.

Commerce argues that while the Court agreed that the "same person" test was effective in determining that AST after privatization was the same "legal person" that had been the recipient of the GOI subsidy, the Court had directed Commerce to determine that, to the extent that KAI paid fair market value for AST, the original benefit to AST was eliminated. <u>Id.</u> at 18.

Although this court in <u>Acciai I</u> held that Commerce had correctly applied the four prong "same person" test to show that the GOI-owned and KAI-owned AST were the same person, the court also found the "same person" test to be inherently flawed and contrary to the holding in <u>Delverde III</u>. Slip Op. 02-10 at 30-38. In addition to the court's decision in <u>Acciai I</u>, the Federal Circuit in <u>Allegheny II</u>, 367 F.3d at 1350, held that Commerce may not employ the "same person" methodology to calculate countervailing duties. Upholding this court's determination in <u>Allegheny Ludlum Corp. v. United States</u> ("<u>Allegheny I</u>"), 246 F. Supp. 2d 1304 (CIT 2002), the Federal Circuit in <u>Allegheny II</u> stated that

> although the same-person methodology masquerades as a test with factual

14

components, the trial court correctly perceived that it is a per se rule for all practical intents and purposes, completely ignoring the complexity inherent in a privatization. Without regard to the specifics of the privatization, the same-person methodology merely determines whether the pre-privatization and post-privatization entity is the same corporate person. To be sure, four factors govern this determination, including the continuity of general business operations, the continuity of production facilities, the continuity of assets and liabilities, and the retention of personnel. But should Commerce determine that the same person survived the privatization, the liability for the countervailing duty prior to privatization would automatically and necessarily carry over to the post-privatization entity without regard to all relevant facts and circumstances. For instance, the same-person methodology would never consider whether the purchasers adequately compensated the seller (i.e., the foreign government) for the entirety of the acquired business and thus repaid any past subsidies. This facile determination is therefore a per se rule in disguise. Delverde III expressly prohibits such an abbreviated approach in examining the totality of the economic circumstances to determine whether the pre-privatization countervailable subsidy carries over post-privatization.

367 F.3d at 1347-48 (citing Delverde III, 202 F.3d at 1366). Allegheny has not distinguished this case sufficiently to justify an alternate result. Therefore, the "same person" test is still not in accordance with the law.

## C
### Commerce's Change-in-ownership Analysis Needs to Be in Compliance with U.S. Statute and Case Law and Requires a Benefit Analysis

Allegheny argues that Commerce should revise its change-in-ownership analysis by clarifying how the benefit from prior subsidies continues even upon changes in ownership. Redetermination at 18-19. Allegheny claims that CVD law shows that a reexamination of the benefit concept is not required. Id. at 19.

Commerce argues that it provided adequate explanation of the evidence underlying its "same person" methodology in the Remand Determination, which is consistent with Delverde III. Id. Even though Commerce states that it "does not agree with the Court's reading of Delverde

15

III," it claims it is "bound by its decision" and "properly undertook the analysis contemplated" by the court. Id.; Defendant's Response at 10.

In light of the holding that both *per se* tests – the "same person" test, in Acciai I, and the "full value" test, here – contravene U.S. statute and case law, Commerce must conduct its change in ownership analysis based on the methodology it develops pursuant to 19 U.S.C. § 1677(5), Delverde III, and Allegheny II. It is insufficient for Commerce to point to facts supporting its discredited "same person" methodology and to incorporate them by reference to justify its position in this Redetermination. Furthermore, because Commerce has employed the *per se* "full value" test, it has equated AST's full value sale with the benefit received. This becomes apparent when one compares Commerce's arguments in Comment 7 in the Redetermination, concerning whether there had been an FMV transaction, with facts it used in the text of the Redetermination in its purported benefit analysis.[10] See Redetermination at 23-26, 7-14. The issue is therefore remanded to Commerce to examine and explain how, despite the change of ownership, the *benefit* of prior subsidies to KAI continues to exist.[11]

---

[10] In the text of the Redetermination, Commerce begins its analysis of the privatization of AST stating: "[i]n determining whether KAI received a *benefit* from purchasing AST pursuant to the Court's order of remand . . . ." Redetermination at 7 (emphasis added). Commerce, however, concludes its discussion at the end of the same section saying

> Therefore, although there were aspects of the sales process that potentially limited the number of competitors seeking to purchase AST causing the Department to question whether *full value* was paid for the company, comparison of the price actually paid for AST to market valuations of the company show that *full value* was paid for AST.

Id. at 14 (emphasis added).

[11] Article 1.1 of the WTO Agreement on Subsidies and Countervailing Measures ("SCM Agreement") deems that a subsidy exists if

16

(a)(1) there is a financial contribution by a government or any public body within the territory of a Member (referred to in this Agreement as "government") . . .

. . .

or

(a)(2) there is any form of income or price support in the sense of Article XVI of GATT 1994;

and

(b) a benefit is thereby conferred.

Section 1677(5)(B) of the U.S. Code closely tracks this definition. Article 14, Calculation of the Amount of a Subsidy in Terms of the Benefit to the Recipient, of the SCM Agreement provides that

> any method used by the investigating authority to calculate the benefit to the recipient conferred pursuant to paragraph1 of Article1 shall be provided for in the national legislation or implementing regulations of the Member concerned and its application to each particular case shall be transparent and adequately explained. Furthermore, any such method shall be consistent with the following guidelines:
>
> > (a) government provision of equity capital shall not be considered as conferring a benefit, unless the investment decision can be regarded as inconsistent with the usual investment practice (including for the provision of risk capital) of private investors in the territory of that Member;
> >
> > (b) a loan by a government shall not be considered as conferring a benefit, unless there is a difference between the amount that the firm receiving the loan pays on the government loan and the amount the firm would pay on a comparable commercial loan which the firm could actually obtain on the market. In this case the benefit shall be the difference between these two amounts;
> >
> > (c) a loan guarantee by a government shall not be considered as conferring a benefit, unless there is a difference between the amount that the firm receiving the guarantee pays on a loan guaranteed by the government and the amount that the firm would pay on a comparable commercial loan absent the government guarantee. In this case the benefit shall be the difference between these two amounts adjusted for any differences in fees;

17

**D**

**The Purchase Price Does Not Have to Specifically Itemize the Repayment of Subsidies**, **But the Repayment of Subsidies Should Be Addressed in the Change in Ownership Analysis**

Allegheny argues that, absent a specific itemization in the AST Purchase Agreement that

> (d) the provision of goods or services or purchase of goods by a government shall not be considered as conferring a benefit unless the provision is made for less than adequate remuneration, or the purchase is made for more than adequate remuneration. The adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service in question in the country of provision or purchase (including price, quality, availability, marketability, transportation and other conditions of purchase or sale).

By neither having a statutory provision nor a regulation under U.S. law that defines "benefit," the U.S. Government has seemingly abdicated its international obligations.

The term "benefit" also has been litigated in the WTO dispute settlement system. First, the WTO Appellate Body ("AB") in Canada - Measures Affecting the Export of Civilian Aircraft, WT/DS70/AB/R, ¶ 154 (Aug. 2, 1999) ("Canada – Aircraft"), upon examination of Article 1.1(b) of the SCM Agreement, determined that "benefit" refers to the benefit to the recipient of the subsidy and not the "cost to government." The AB also stated that the "marketplace provides an appropriate basis for comparison in determining whether a 'benefit' has been 'conferred . . . .'" Canada – Aircraft, ¶ 157. Second, in United States – Countervailing Measures Concerning Certain Products from the EC, WT/DS212/AB/R (Jan. 8, 2003) ("US – Countervailing Measures"), the AB reversed the lower panel's finding that there is an irrebuttable presumption that following an FMV privatization sale any benefit from a prior financial contribution is extinguished. The AB instead determined that a rebuttable presumption of the extinguishment of the subsidy exists. The AB reasoned that the WTO Member's investigating authority should consider the nature of the market within which the sale occurred and conduct an inquiry on the basis of the facts in the case. It should be noted that the AB in US – Countervailing Measures also found that Commerce's "same person" methodology was WTO-inconsistent.

Neither the WTO legal texts nor the AB and panel reports have direct applicability under U.S. law. The reasoning in those materials, however, can useful for clarifying the subsidy provisions at issue in this case.

a portion of the purchase price is dedicated to the repayment, the original subsidies to AST continue to be countervailable. Redetermination at 18; Allegheny's 7-25 Remand Comments at 11-15.  Allegheny also claims that Commerce should revise its methodology to determine whether the buyers repaid the prior subsidies. Redetermination at 19.  Allegheny derives this latter argument from a specific exchange between the court and counsel for Defendant to suggest that an "additional payment" beyond the fair market value purchase price needed to be shown in order to extinguish past subsidies.[12] Allegheny's 4-30 Comments at 4-5 (emphasis in original). Allegheny asserts that the previous subsidy benefits were not accounted for in the price paid for AST, as evidenced in the Purchase Agreement, and therefore AST continued to benefit from the privatization transaction. Id. at 7; Redetermination at 20.

Plaintiffs argue that nothing in Acciai I requires that Commerce's methodology take into

---

[12]    *The court*: {S}upposing, given the facts of this case, in fact not only had a full purchase price been paid, but there had been an arm's length negotiation where they said, "Look, there were these subsidy benefits conferred, They're worth this much. And here is what we paid for them."
*Mr. Lau*: My understanding is that the concept of repayment still exists … I looked through these remand results with great detail, and unless I'm mistaken, I don't see a lot of discussion of that… Perhaps this is one of those issues that must await another day - must -
*The court*:  Hmm, interesting.
*Mr. Lau*: - await a situation where there's a transaction out there, and part of the purchase price is specifically paid -
*The court*:  Oh, I know what you're saying.
*Mr. Lau*:  - so as to - so as to re-pay the prior countervailable subsidies. I simply do"t know what the answer is, and perhaps the Agency, itself, doesn't know the answer until the facts are presented before it.

(Transcript of Oral Argument Before Judge Evan J. Wallach in Acciai Speciali Terni, S.p.A. v. United States, January 23, 2002 at 15, 25.)  Discussions with the court at oral argument are, of course, just that, discussions, unless they represent a ruling by the court or a binding concession by a party.  The colloquy here is neither.

account whether there has been an express repayment of prior subsidies. Redetermination at 20. Plaintiffs say that such requirement would be contrary to the holding in Delverde III as it made no such explicit requirement. Redetermination at 20; Plaintiffs' 7-25 Comments at 9.

Commerce argues that while the Purchase Agreement does not contain an explicit provision concerning the repayment of subsidies, that description is not dispositive. Redetermination at 21. Commerce states that using Defendant-Intervenor Allegheny's approach that explicit itemization is required would assume a new *per se* rule. Id. at 18. Commerce asserts that, regardless of how the parties have chosen to depict the nature of the sale in the Purchase Agreement,

> we believe that the Court directed the Department to determine whether the price paid by KAI was equal to the fair market value of the company. Where that condition was satisfied, we believe that we were required to find that the original subsidies to AST were extinguished, regardless of how that price may have been described in the purchase agreement.

Id. at 18, 21.

In conducting its analysis under 19 U.S.C. § 1677(5) to determine whether prior subsidies have been extinguished, Commerce needs to consider whether the subsidies have been repaid. In Allegheny II, the Federal Circuit explained that one of the deficiencies of the same-person methodology was that

> [i]n seeking any benefit that the purchaser might have indirectly received from the prior subsidies, that methodology refused to consider that the state . . . may have received full remuneration for the subsidy. *In other words, Commerce refused to inquire whether the privatization transaction fully repaid the subsidy to the state.*

367 F. 3d at 1346 (emphasis added). The Federal Circuit further argued that in using the same-person *per se* test, the

> methodology precluded consideration of all the particulars of the transactions and

instead unnecessarily limited the assessment to non-market factors such as the identity of the pre- and post-privatization facilities and personnel. These limited inquiries [did] not directly address the economic indicators of the *repayment of a past subsidy*.

Id. (emphasis added). Moreover, the Federal Circuit faulted the same-person methodology for not considering "whether the purchasers adequately compensated the seller . . . for the entirety of the acquired business and thus repaid any past subsidies." Id. at 1347. The Federal Circuit's language suggests that Commerce must conduct a change in ownership analysis, avoiding a *per se* test, that evaluates whether prior subsidies have been repaid.

In this Redetermination, Commerce has presented this court with another *per se* methodology, the "full value" test. As discussed *supra*, the "full value" test is facially the type of abbreviated and factually presumptive approach, which was prohibited by Delverde III. See Allegheny II, 367 F.3d at 1347-48 (citing Delverde III, 202 F.3d at 1366). Commerce should examine the totality of the economic circumstances to determine whether the pre-privatization subsidy carries over to the post-privatization entity. See Id. (emphasis added). Employing yet another *per se* test for determining whether a subsidy and its benefits have been extinguished with regard to the repayment of subsidies raises the same issues discussed by the Federal Circuit in Allegheny II. The test, for example, fails to take into account market and non-market factors that may affect the actual value of the prior subsidy as opposed to the actual currency value of the subsidy when it was paid by the GOI.[13] See Allegheny I, 246 F. Supp. 2d at 1310 (emphasis

---

[13] This court in Allegheny I presented an effective example of this point

> if a corporation had a full fair-market value of $ 100 million at the time of sale and received a $ 50 million subsidy, Plaintiffs would require that the new purchasers/ owners pay $ 150 million to extinguish the subsidies. However, if the corporation invested the $ 50 million subsidy in property, plant and equipment that became outdated or unproductive, the value of the corporation could change

21

added).  In other words, the FMV character of a sale may not definitively quantify the value of a subsidy which has been repaid and extinguished.

Commerce is ordered on remand to consider whether there has been a repayment of subsidies when it considers the totality of economic circumstances that surrounded the privatization of AST.  Although Commerce is not required to request itemization or explicit repayment of pre-privatization subsidies, it must show that the circumstances of the sale demonstrate the extinguishment of the subsidy.  Counsel for Defendant during the October 16, 2003, oral argument argued that it is not Commerce's practice to look beyond the currency value of a subsidy bestowed to determine the amount of the subsidy.  Pragmatically, in order to comply with the statute and the case law in its benefit analysis, Commerce, for example, may analyze the value of the subsidy to the purchaser and in turn if it was repaid.  It is, however, within Commerce's discretion to derive the most accurate methodology to analyze privatization transactions. GTS Indus. S.A. v. United States, 182 F. Supp. 2d 1369, 1379 (CIT 2002) (citing to Delverde III, 202 F.3d at 1367, citing H.R. Rep. No. 103-826(I), at 110 (1994)).  Therefore, the court remands this issue so Commerce can employ a methodology which takes into account the court's instructions.

_____

significantly.  It could be determined that the full fair market value of the corporation and the subsidies given prior to and/ or during privatization, is $ 125 million.  In addition to the reasons given in this simplistic example, there are numerous reasons why the full fair-market value of the corporation, including the value of subsidies, is less than the absolute dollar value of $ 150 million.  Conversely, there could be conditions where a previous subsidy could become so valuable that new purchasers/ owners would be willing to pay a premium for the corporation, which could increase the full fair-market value beyond $ 150 million.

246 F. Supp. 2d at 1310.

**E**

**Commerce's Determination that the Sale of AST Was an FMV Transaction Is Supported by Substantial Evidence and Is in Accordance with Law**

Allegheny contends that the sale of AST by GOI was not through a FMV transaction for three alleged reasons: 1) a faulty bidding process, 2) the incorrect valuation of AST, and 3) conditions of the sale, not considered by Commerce, which affected the price of AST. Redetermination at 21. Defendant and Plaintiffs, however, argue that the terms of the transaction engendered a full value sale. Commerce's determination that the sale of AST was an FMV transaction is supported by substantial evidence.[14]

**1**

**Commerce's Finding that the Bidding Processes Which Led to the Sale of AST Provided for an FMV Transaction Is Supported by Substantial Evidence**

Allegheny claims the presence of only one final bid, due to restrictions on and obstacles to the potential bidders, precluded a FMV transaction. Redetermination at 21.

Plaintiffs argue that the bidding process at issue produced a full value sale. Plaintiffs argue that Instituto per la Riconstruzione's ("IRI")[15] intention to sell AST and the solicitations of expressions of interest in the company were publicized, yielding nineteen expressions of interest. Plaintiffs' 7-25 Comments at 4. Plaintiffs claim that two months (March 15 to May 13) were a sufficient period of time in which to prepare final bid offers for AST, that final offers were

---

[14] If it were to examine Commerce's determination *de novo*, the court might find otherwise. The court, however, may not reweigh the evidence or substitute its own judgment for that of the agency. See Granges Metallverken AB v. United States, 13 CIT 471, 474 (1989).

[15] As noted in Acciai I, IRI was the GOI's holding company that owned AST at the time of the privatization.

indeed submitted, and that any company in the position to be a purchaser of AST had sufficient time to make a timely offer. Redetermination at 22; Plaintiffs' 7-25 Comments at 5-6. In addition, Plaintiffs claim that [a certain fee] requirement, a [certain amount] when AST's estimated net worth at the time was estimated at [ a certain amount], was not an undue obstacle or restriction in the purchase process for AST, again particularly for those companies which were able to buy a large steel company. Id. at 22; Plaintiffs' 7-25 Comments at 6-7. Plaintiffs also claim that the perception that the GOI would favor a bid including Italian partners was unfounded and it would have violated EU and Italian law, the terms of the privatization plan, and IRI's intention to sell to the highest bidder. Id. at 23; see Plaintiffs' 5-24-02 Comments on Second Remand Redetermination ("Plaintiffs' 5-24 Comments") at 4; Plaintiffs' 7-25 Comments at 7-8.

Commerce found that, even though the bidding process for the sale of AST was at times suspect, it did produce a full value sale. Commerce disagrees with Plaintiffs that sufficient time and information about AST were afforded to the bidders in the final bid process. Redetermination at 23. Commerce notes that the bid by, Ugine, was rejected as Ugine offered to purchase only 35 percent of AST because it did not have enough time to finalize agreements with potential partners to bid for the remaining shares of AST. Redetermination at 23. On the issue of the single final bid, Commerce agrees that the various facets of the bidding process may have hampered participation in the process; there were eventually two bids  - one which was rejected and the other subject to further negotiations. Though Commerce finds that more bids might have shown that a FMV transaction had occurred, it says that the existence of one or two final bids does not mandate an opposite conclusion. Redetermination at 24.

24

Commerce further says that while it is unclear that [a certain fee] itself affected the final bidding process, it may have placed more impediments in the bidding process in conjunction with the other factors particularly for smaller bidders. Redetermination at 23. Also, regarding the favoring of Italian bidders, Commerce notes that Krupp and Ugine clearly believed that the GOI was planning to favor bidders with Italian partners. Commerce states that while it is unclear whether this was a misperception regarding the bidding process, the belief that the GOI would act in this fashion was sufficient to affect the bidding process. Redetermination at 24.

Commerce's determination that the bidding processes that led to the sale of AST did not affect the FMV nature of the sale, however, is supported by substantial evidence. In considering the sale, Commerce states that

> although there were aspects of the sales process that potentially limited the number of competitors seeking to purchase AST causing the Department to question whether full value was paid for the company, comparison of the price actually paid for AST to market valuations of the company show that full value was paid for the AST.

Redetermination at 14. Commerce has shown through its factual analysis that it has come to its conclusion that the bidding process produced a full value sale, by considering certain competitive and less competitive aspects of the sale. Commerce has conceded that the bidding process became more restrictive through the final days of the process. In addition, Commerce has stated that more final bids would have been a better indicator of a full value sale. Commerce has also considered that, if the company, Krupp's, perception was correct and the GOI had favored Italian bidders, this might have reduced the likelihood of a full value sale. Commerce has thus confronted those issues which call into question the reasonableness of its findings and nevertheless determined that the bidding processes did not affect the full value nature of the sale.

25

The court affirms Commerce's factual determinations as long as they are reasonable and supported by the record, "including whatever fairly detracts from the substantiality of the evidence." See Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Commerce's decision is supported by substantial evidence and must, therefore, be affirmed.

**2**
**Commerce's Determination that AST Was Correctly Valued Is Within Its Discretion**

Allegheny claims that AST was undervalued and thus the sale was not an FMV transaction. Allegheny argues that the studies prepared in preparation for the sale of AST underestimated its actual value. Redetermination at 21. Defendant-Intervenor points to the IMI Report which showed, in a questionable accounting maneuver, that [a certain amount] was moved from equity to a provision for restructuring to reduce AST's net worth from [a certain amount] to [a certain amount ]. Redetermination at 21-22. Allegheny also refers to the Morgan Grenfell Report which reported that deferred tax assets could increase AST's price by [a certain amount]. Redetermination at 21-22. Allegheny argues these factors were erroneously unaccounted for in Commerce's inquiry.

Commerce argues that the valuations of AST did provide for the full or market value of AST. Commerce does not believe the classification of equity as contingent liability should be considered an accounting maneuver, as it was essentially an adjustment of AST's May 1993 balance sheet and did not result in an undervaluation. See Redetermination at 24-25. Also, Commerce states that while deferred tax assets were not included in the Morgan Grenfell report's value determination, the value of assets is dependant on the AST's taxable income and the [amount] cited by Morgan Grenfell is what the deferred tax assets "could" be worth.

26

Redetermination at 25. Commerce comments that even if the *highest* estimated value of the deferred tax credits were added to the *highest* estimated value of AST, the total would only exceed the price KAI paid for AST by [a certain amount]. Redetermination at 25 (emphasis in original).

Plaintiffs argue that Commerce correctly dismissed Allegheny's contention that the valuation studies provided inadequate information of the full or market value of AST. Plaintiffs' 7-25 Comments at 2. Plaintiffs claim that Commerce found rightly that the valuation reports did not misclassify AST's equity or misrepresent a tax shield. Plaintiffs' 7-25 Comments at 2.

Commerce's decision that the valuations of AST did provide for the full or market value of AST is supported by substantial evidence. It was within Commerce's discretion to accept and interpret the evidence before it in coming to its conclusion. "This Court lacks authority to interfere with the Commission's discretion as trier of fact to interpret reasonably evidence collected in the investigation." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1092 (1988) (citing Copperweld Corp. v. United States, 12 CIT 148 (1988)). Therefore, Commerce's determination that AST was valued correctly is supported by substantial evidence.

**3**
**Commerce's Determination that the Terms of AST's Sale Permitted a Full Value Transaction Is Supported by Substantial Evidence**

Allegheny claims that the presence of conditions, such as retention of workers, limitations on the freedom of new shareholders, and restrictions on KAI's resale of AST and its subsidies, that affected the valuation of AST, were not considered by Commerce in determining the presence of a FMV transaction. Redetermination at 21; Allegheny's 4-30 Comments at 9; Allegheny's 5-24 Comments at 19. Because of these conditions, Allegheny argues that the GOI's

control over AST extended beyond the 1994 sale and affected the price parties were willing to bid for the company. Redetermination at 22. Allegheny further argues that there had been massive aid and debt forgiveness to the company and that privatization "engendered additional subsidies to the company." Allegheny's 4-30 Comments at 10 (emphasis in original). Plaintiffs claim that Commerce did not closely enough examine the terms of the Purchase Agreement which evidences that such terms and conditions could not have been part of a full value sale. Redetermination at 22; see Allegheny's 5-24 Comments at 4-5, 15.

Commerce states that the terms of the privatization offered by IRI produced a full value sale. Commerce argues that it is not in a position to speculate on what would have been different had IRI offered a different "package" when AST was privatized. Redetermination at 26.

Plaintiffs argue that Commerce correctly found that the terms of the sale allowed the sale to be at full value. Plaintiffs' 7-25 Comments at 2. Plaintiffs state that Commerce's approach of looking at the full package offered by IRI was correct. Id. at 2-3.

Commerce's determination that the privatization "package" offered by IRI engendered a full value sale is supported by substantial evidence. Commerce says that it looked at the sale as it was fashioned by IRI to determine whether the process was open and competitive and whether the price IRI received was in line with the valuations made by outside parties. Redetermination at 26. Based on those facts, Commerce determined that KAI had paid full value for AST. Commerce has looked at the privatization "package" and does not have to consider a hypothetical set of facts for a point of comparison. Accordingly, Commerce's finding that the terms of AST's sale produced a full value sale is supported by substantial evidence and is in accordance with law.

28

# V
## CONCLUSION

Based on the reasons set forth above, the court remands this matter to Commerce so that it may conduct further proceedings consistent with this opinion.


_____/s/ Evan J. Wallach_____
Judge


Dated: November 12, 2004
      New York, New York