**Slip Op. 05-19**

**United States Court of International Trade**

<table>
<tr><td>

ALLEGHENY LUDLUM CORP., J&L SPECIALTY
STEEL, INC., BUTLER ARMCO INDEPENDENT
UNION, UNITED STEELWORKERS OF AMERICA,
AFL-CIO/CLC, and ZANESVILLE ARMCO
INDEPENDENT ORGANIZATION,

Plaintiffs,

   v.

UNITED STATES,

Defendant,

and

THYSSENKRUPP ACCIAI SPECIALI TERNI,
S.p.A. AND THYSSENKRUPP AST USA,

Defendant-Intervenors.

</td>
<td>

Before: Pogue, Judge

Court No. 03-00919

</td></tr>
</table>

[Commerce's Determination remanded]

February 8, 2005

COLLIER SHANNON SCOTT, P.L.L.C. (David A. Hartquist, Kathleen W. Cannon, Eric R. McClafferty), for Plaintiffs.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, David D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Robert E. Nielsen, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant United States Department of Commerce.

HOGAN & HARTSON, L.L.P. (Lewis E. Leibowitz, Lynn G. Kamarck), for Defendant-Intervenors.

**POGUE, JUDGE:** Plaintiff ("Allegheny") seeks this Court's review of Commerce's application of its latest methodology for determining when the privatization of a foreign firm extinguishes a subsidy that is the basis for a countervailing duty order.  The case arises from the privatization of the Italian state-owned steel group ILVA. ILVA, during much of the 1980's and early 1990's, was subsidized by the Government of Italy ("GOI") through major restructurings and bailouts.[1]  After investigating the subsidies, but prior to ILVA's privatization, the Department of Commerce ("Commerce") issued an order imposing countervailing duties on ILVA's importations into the United States.  See Stainless Steel Sheet and Strip in Coils from Italy, 64 Fed. Reg. 30,624 (Dep't Commerce June 8, 1999) (final affirmative countervailing duty determination).  Plaintiff now challenges Commerce's determination that these subsidies were extinguished upon the privatization of ILVA and, therefore, the modification of the countervailing duty order.  The Court finds that Commerce's determination is not supported by substantial evidence and remands this determination for further consideration consistent with this opinion.

---

[1]In Acciai Speciali Terni S.p.A. v. United States, slip op. 04-140 (CIT Nov. 12, 2004), the court analyzed a case similar to the one at issue here under a different Commerce methodology. The court found that that methodology employed an impermissible "per se" test.  Id. at 21.

## BACKGROUND

ILVA's privatization was initiated on December 12, 1992 when the Italian Council of Ministers gave their approval for the privatization. See Dep't of Commerce Mem. from Deputy Assistant Sec'y, Imp. Admin., Group I to James J. Jochum, Assistant Sec'y for Imp. Admin., Re: Issues and Decision Memorandum for the Determination under Section 129 of the Uruguay Round Agreements (Oct. 24, 2003), P.R. Doc. No. 33[2], Pl.'s Ex. 1 ("Determination") at 3. The GOI established a holding company, Istituto per la Riconstruzione Industriale ("IRI"), to initiate a restructuring and privatization plan. Id. The plan called for the demerger of ILVA into two corporations: AST (the entity in controversy in this case) and ILVA Laminati Piani S.R.L. ("ILP"), and placed the remaining assets and liabilities in ILVA Residua which was to be liquidated. Id. To advise with the sale of AST, IRI hired a private consultant, Barclays de Zoete Wedd Limited ("BZW"), and commissioned a valuation study by Istituto Mobiliare Italino S.p.A.("IMI"). Id. at 3,5. IRI requested that the latter devise a valuation of AST so as to provide an "appropriate" rate of return to prospective purchasers. Istituto Mobiliare Itlaliano S.p.A., Company Appraisal of "Acciai Speciali Terni" (August 25, 1993),

---

[2]Documents contained on the public record are cited as "PR," followed by the document list in which they are contained, followed by the document number. Documents in the confidential record are cited as "CR," followed by the document list in which they are contained, followed by the document number.

Pl.'s Ex. 5 at 3.

In December 1993, IRI publicly announced its intention to sell AST and ILP through advertisements in the Italian and foreign newspapers. Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 3. Interested parties were required to submit information about themselves such as copies of their incorporation and bylaws. Id. at 3 n.4. In response, nineteen private industrial and financial entities had expressed interest by January 7, 1994. Id. at 4. During this period, the bulk of AST's debt was placed in ILVA Residua. Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 8. IRI also commissioned another valuation study, by Pasfin Servizi Finanziari ("Pasfin"), to determine what price it could get for AST. Id. at 5.

With nineteen potential bidders, IRI inaugurated the second stage of the bidding process. Id. at 4. In this stage, IRI required that the interested parties submit preliminary, non-binding cash offers for 100 percent of AST's shares. Id. Pursuant to these requirements, four parties submitted non-binding purchase offers. In March, IRI set forth the requirements for the final stage of bidding, compelling submission of final offers by May 13, 1994 (allowing two months to conduct due diligence), see id., and requiring a guarantee for the purchase of AST, see Dep't of Commerce Mem. from Deputy Assistant Sec'y, Imp. Admin., Group I to James J. Jochum, Assistant Secretary for Imp. Admin., Re: Issues

and Decision Memorandum for the Determination under Section 129 of the Uruguay Round Agreements Act (Oct. 24, 2003), C.R. Doc. No. 11, Pl.'s Ex. 9 ("Confidential Determination") at 6. There is also a suggestion in the record that IRI would favor bids from parties that included Italian investors. Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 6. Only two parties submitted final bids: KAI Italia S.r.L. ("KAI") (Defendant-Intervenor TKAST's predecessor in interest) and Ugine (a French steel producer). Id. at 4. However, IRI disqualified Ugine's final bid as nonconforming with the bidding requirements, because it did not bid for 100 percent of AST's shares, and thereby awarded the sale to KAI. Id. KAI, in part, based its bid on a valuation study prepared by Morgan Grenfell in May which it submitted as part of the Record. Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 7. The amount bid for AST was well in excess of the two market valuation studies prepared for AST and above that prepared by KAI's own consultant. Id. Additionally, after the final bids were submitted and Ugine had been disqualified leaving KAI as the only purchaser in the running, IRI empowered BZW to further negotiate with KAI to improve the offer. Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 3. As a result of these negotiations, KAI ended up paying more than it had bid for AST. Id.

## PROCEDURAL HISTORY

This case arises from an administrative review made pursuant to Section 129 of the Uruguay Round Agreements Act, 19 U.S.C. § 3538 (2000) ("Section 129").  The Section 129 review followed the World Trade Organization Appellate Body's Decision ("WTO") in United States – Countervailing Measures Concerning Certain Products from the European Communities, WT/DS212/AB/R (Dec. 9, 2002). Section 129 authorizes Commerce to revise its determinations to make them consistent with WTO decisions.  See 19 U.S.C. § 3538(b). Plaintiff brought a timely appeal of the Section 129 Determination and the Court has jurisdiction over Allegheny's complaint under 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

The Court reviews Commerce's decision to determine whether it is supported by substantial evidence and in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(2002).

## DISCUSSION

Under Commerce's new methodology for determining when the privatization of a firm extinguishes a subsidy,[3] Commerce creates

---

[3]Promulgated in 2003, Commerce's new methodology seeks to address concerns raised by the Federal Circuit's opinion in Delverde Srl v. United States, 202 F.3d 1360, 1365 (Fed. Cir. 2000) ("Delverde III") as well as by the WTO.

three stages of inquiry in which the presumption that a subsidy is countervailable shifts between the importer and interested parties looking to impose a countervailing duty.  First, Commerce asks whether a countervailable subsidy was conferred prior to the sale of the company.  <u>Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act</u>, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003) ("Methodology").  If Commerce finds that a non-recurring subsidy was conferred, Commerce creates a baseline presumption that the subsidy is countervailable over the corresponding useful life of the recipient's assets.  <u>Id.</u>

Nevertheless, an interested party may rebut this presumption where that party demonstrates that a "privatization occurred in which the government sold its ownership of all or substantially all of a company or its assets . . . and that the sale was an arm's-length transaction[4] <u>for</u> fair market value."  <u>Id.</u> (emphasis added).  If the sale was not an arm's-length transaction for fair market value, Commerce will find that the presumption has not been overcome and the subsidy will remain countervailable.  Conversely, if Commerce concludes that the sale was at arm's-length for fair

---

[4]The definition of an arm's-length transaction used by Commerce is "a transaction negotiated between unrelated parties, each acting in its own self-interest, or between related parties such that the terms of the transaction are those that would exist if the transaction had been negotiated between unrelated parties."  <u>Determination</u>, P.R. Doc. No. 33, Pl.'s Ex. 1 at 4-5. Neither this definition nor Commerce's finding that the sale occurred at arm's-length is at issue in this case.

market value, any "pre-sale subsidies will be presumed to be extinguished in their entirety and, therefore, non-countervailable." Id.

Despite a finding that the assets have been sold at arm's-length for fair market value, an interested party may rebut this latter presumption of extinguishment upon a demonstration that "at the time of the privatization, the broader market conditions necessary for the transaction price to reflect fairly and accurately the subsidy and benefit were not present, or were severely distorted by government action (or, where appropriate, inaction)," id. (footnote omitted), such that "the transaction price was meaningfully different from what it would otherwise have been absent the distortive government action," id. at 37,128. If a party demonstrates that broader market distortions existed, the subsidy will remain countervailable; if a party does not demonstrate such distortions, the duties will be deemed extinguished. Id.

In this case, TKAST concedes that AST did receive non-recurring countervailable subsidies from the GOI; therefore, this issue is not in dispute. However, TKAST submits that the presumption that the subsidy remained countervailable was overcome by the sale of AST in an arm's-length transaction for fair-market value and that distorting factors did not upset an inference that the sale extinguished the subsidy. Allegheny does not challenge

Commerce's methodology.  Rather, Allegheny contends that Commerce's determinations violated its own methodology and are not supported by substantial evidence as discussed below.

## A. THE SIGNIFICANCE OF A FAIR MARKET VALUE DETERMINATION

Under the countervailing duty law, a firm receives a subsidy if it gets something it did not pay for, i.e., when a government sells assets for less remuneration than the assets are worth, the buyer receives a benefit from that government.  See 19 U.S.C. § 1677(5)(E)(iv) (a benefit includes the sale of goods "provided for less than adequate remuneration"); cf. United States – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom, WT/DS138/AB/R (May 10, 2000) at 25 ("The question whether a 'financial contribution' confers a 'benefit' depends, therefore, on whether the recipient has received a 'financial contribution' on terms more favorable than those available to the recipient in the market.").  As applied to the purchase of a firm which has received a prior subsidy, if a buyer does not remunerate the government for the value of the company plus the value of the subsidy at the time of purchase, then the buyer receives a benefit.  For example, if a firm is valued at $100 million, and the government contributes a $50 million value to the firm,  then the value of the firm is $150 million (assuming no depreciation or appreciation between the time

of the subsidy and sale and that the contribution actually conferred an economic value of $50 million[5]).

The fair market value of the company takes into account all of a company's liabilities and assets including assets that were incurred with government support.  Therefore, the payment of fair market value means that the purchasing firm did not receive more than it paid for (assuming the government did not distort the market in a manner affecting the sale.)  That the aggregation of the monetary amount of past subsidies is not an appropriate benchmark for whether the purchase price reflected the value of the subsidies has been firmly established and warrants no further consideration here.  See Acciai Speciali Terni S.p.A. v. United States, slip op. 04-140 at 21 & n.13 (CIT Nov. 12, 2004), Allegheny Ludlum Corp. v. United States, 246 F. Supp. 2d 1304, 1310, 26 CIT ___, ___, (2002).

Appropriately, Commerce's inquiry focuses on whether the sale price was at fair market value.  When a company or assets are sold under a transparent competitive bidding system, the potential

---

[5]The observation that the value of a given subsidy may have depreciated, or not have conferred future value to a firm, was discussed in  Allegheny Ludlum Corp. v. United States, 246 F. Supp. 2d 1304, 1310, 26 CIT ___, ___, (2002).  That a subsidy may not confer an actual economic value equal to the monetary amount of the subsidy simply reflects the reality that the government often has other interests than economic profit such as full employment or granting favor to certain constituents.  For example, the government may have provided the upkeep of obsolete facilities to keep workers employed even though such upkeep would not be justified in terms of cost feasibility.

buyers will, at least theoretically, push the purchase price to its fair market value.  Therefore, the winning firm will not get more value than that for which it paid.[6]  However, this theoretical analysis assumes that the bidding process will drive the sale price so as to reflect the value of the company (including the subsidy) and its assets.  This assumption is somewhat precarious under the facts and circumstances of a privatization.  The seller, a government which has manifested an interest in conferring benefits on domestic industries by virtue of past subsidies, may have motives other than recouping the highest price for the company and its assets, and therefore may constrain or manipulate the sales process to benefit domestic industries or serve some other governmental interests.  Delverde III, 202 F.3d at 1369.  One cannot simply assume that the invisible hand of the market will work its magic where there are so many interests at work and the hand of the government is so visible.  See United States – Countervailing Measures Concerning Certain Products from the European Communities, WT/DS212/AB/R (Dec. 9, 2002) at 61 (during privatizations "market conditions are not necessarily always

---

[6]This assumes, among other things, that the threat of countervailing duties is not factored into the purchase price. If they are, the purchase price will be reduced.  Therefore, if the United States does not impose countervailing duties, the purchaser will obtain a windfall, i.e., the amount of money that buyers thought would be countervailed.  This point was not addressed by either party and the Court will not raise it sua sponte.

present and they are often dependent on government action."). That the sale process may be open to manipulation, or otherwise distorted, is recognized by 19 U.S.C. § 1677(5)(F) and case law.[7] See, e.g., Allegheny Ludlum v. United States, 367 F.3d 1339 (Fed. Cir. 2004), cf. Saarstahl AG v. United States, 78 F.3d 1539, 1544 (Fed. Cir. 1996). Both require Commerce to look behind a sale to ensure that competitive bids were made, and that the government did not distort the terms of the sale, such that the sale price truly reflected the value of the privatized company or assets as would be assigned by the market in a sale between private parties under the terms of the sale. Cf. Allegheny, 367 F.3d at 1347.

Commerce's new methodology recognizes this concern insofar as it frames "the basic question [of whether a subsidy has been extinguished as] whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under prevailing market conditions was paid, and paid through monetary or equivalent compensation." Methodology, 68 Fed. Reg. at 37,127. Accordingly, "[a] primary consideration in this regard normally will be whether the government failed to maximize its

---

[7]Pursuant to 19 U.S.C. § 1677(5)(F):

A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

return on what it sold, indicating that the purchaser paid less for the company or assets than it otherwise would have had the government acted in a manner consistent with the normal sales practices of private, commercial sellers in that country."[8]  To conduct this inquiry, the new methodology sanctions two approaches: (1) an inductive approach, using a benchmark analysis wherein Commerce compares the sales price with "comparable benchmark prices" and (2) a deductive approach using a process of sale analysis wherein Commerce looks at "process factors" to determine if the sale was manipulated or distorted such that the bid accepted by the government would not reflect the fair market value of the company or assets.  Id.

In this case, Commerce made a threshold determination that the sale was at arm's-length because the seller, AST, and the purchaser, TKAST, were unrelated. Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 4-5.  Accordingly, it proceeded into its second line of analysis to determine whether the arm's-length sale was at fair market value.  Commerce concluded that there was "no evidence in the record of any contemporaneous sales of companies comparable to AST nor any appropriate market benchmark price." Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 5. Consequently, Commerce,

---

[8]The Court notes that Commerce did not discuss the norm regarding the sale of steel companies, or any company, in Italy or elsewhere.  Without this benchmark, it becomes difficult for a Court to review a determination that a given sale process is, or is not, atypical.

applying its methodology, was to base its conclusion solely on whether it could infer that fair market value was paid from the manner AST was sold.  In considering the sale process, Commerce identified a non-exhaustive list of factors: (1) Did the government perform an objective analysis of the value of the company? (2) Were there artificial barriers to entry which precluded potential competitors from not participating in the process? (3) Did the government accept the highest bid? and (4) Were there committed investment requirements?[9]  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 5  (citing Methodology 68 Fed. Reg. at 37,127).

Looking at these factors, Commerce observed that there were

---

[9]Allegheny at times attempts to read the methodology strictly and, under this strict reading, alleges that Commerce did not apply its own methodology to the facts.  For example, at one point Allegheny claims that a government must "accept the highest bid" to extinguish the subsidy.  See Pl.'s Rule 56.2 Mem. Law Supp. Mot. J. Agency R., at 18-19 ("Pl.'s Mem.").  According to Allegheny, given that the word "highest" is a word of comparison, because the GOI only considered one bid, its acceptance thereof could not have been the acceptance of the "highest" bid.  Therefore, according to Allegheny, the methodology requires a finding that the subsidy was not extinguished because the GOI did not accept the "highest bid." The Court considers this hyper-technical reading of the methodology unpersuasive.  These factors are non-exhaustive and are intended to assist Commerce in determining whether fair market value was paid which it is required to do by law; moreover, these factors must be read in a manner that promotes the ultimate goal of determining whether fair market value was paid.  Application of the factors enunciated in Commerce's new methodology, without regard to how these factors promote the ultimate goal of determining whether fair market value was paid, is a misapplication of Commerce's methodology, Methodology, 68 Fed. Reg. at 37,127, and accordingly is not in accordance with law, Allegheny Ludlum, 367 F.3d at 1344.

some anomalies in the sale of AST.  Most significantly, although the bidding process started with nineteen interested firms, all the firms except TKAST dropped out of the competition or were disqualified.  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 4. More specifically, the GOI (a) required bidders to guarantee their bids, Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9  at 6; (b) gave a short period to conduct due diligence, Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 6; (c) turned over incomplete documents to the bidders, Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 5; (d) may have required the winning firm to have a partnership with an Italian firm,[10] Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 6; and (e) required committed investments such as restrictions on alienation and maintenance of production and employment at certain levels, Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 7-8.  Commerce found that these restrictions may have deterred firms, especially foreign firms, from bidding on AST.  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 6.  Nonetheless, Commerce found that these factors did not seriously distort the sales process and that the sale price was higher than that reflected in objective valuation studies conducted by third parties.  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 5, 12, Confidential Determination,  C.R. Doc. No. 11, Pl.'s Ex. 9

---

[10]Commerce did not make a definitive factual finding in this regard.  Commerce noted that there was suspicion that this was the case.  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 6.

at 7.  As Commerce concluded:

> On the one hand, there were some real and perceived
> barriers in the bidding process that might have limited
> the number of potential purchasers.  On the other hand,
> there is substantial record evidence that the
> privatization of AST was accomplished through a fair-
> market-value transaction.

Id. at 8.  Allegheny alleges that Commerce's analysis does not

comport with its methodology and its conclusion is unsupported by

substantial evidence.  The Court disagrees with Allegheny's former

contention but agrees that Commerce's decision is not supported by

substantial evidence.


**i. PROCESS FACTORS DO NOT SUPPORT AN INFERENCE THAT FAIR
MARKET VALUE WAS TENDERED**

The Court agrees with Allegheny that an inference that the

sale process resulted in a sale at fair market value is not

supported by substantial evidence as explicated by Commerce in its

determination.  Allegheny contends that if TKAST's competitors had

dropped out of the competition, a rational bidder would not be

induced to offer the full market value for the company.  Pl.'s Mem.

at 18; cf. Enserco, L.L.C. v. Drilling Rig Noram 253, 126 F. Supp.

2d 443, 447 (S.D. Tex. 2000).  TKAST and Commerce counter that

Allegheny has not accurately summarized the facts.  See

Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 12.  Rather, when

TKAST bid for AST, at least one other bidder was still in the

competition and submitted a final bid (although later it was

rejected).  Id.

Theoretically, at least where bidding is in a one-time winner-take-all auction form, a competitor is induced to bid its valuation of the company.  Given that bidders only bid once under such an auction model, a competitor cannot rebid a higher price if its competitors outbid it.  Therefore, assuming bidder A has no knowledge of its opponent's bid, if bidder A does not bid close to the valuation of the company, another bidder will win, and bidder A will lose the competition (and therefore a financial opportunity).  Consequently, TKAST contends, with the specter of competition looming, TKAST had every incentive to bid a price it considered to be fair market value.  The Court agrees with TKAST and Commerce that a reasonable inference can be drawn that TKAST had an incentive to bid its valuation of AST.  See Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 12.

However, the Court also agrees with Allegheny that this fact alone is insufficient to prove that the sale price reflected the fair market value of AST in light of Commerce's findings that there were real and perceived barriers in the bidding process.  Because of these barriers, the process itself does not provide a basis to conclude that the GOI maximized the return on what it sold to justify a fair market value determination.  There is too much uncertainty. TKAST may have bid in good faith on what it perceived fair market value to be;  however, it may have had special

knowledge, it may have wrongly assessed AST's assets, or it may not have been in the position to offer fair market value, such that in a situation with multiple bidders, its bid would have been woefully inadequate. This concern is particularly acute here, where the short period of time permitted to conduct due diligence was acknowledged by a bidder as a significant obstacle in crafting a reliable valuation of AST.  Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9  at 5.  Because of this complication, the Court agrees with Allegheny that Commerce's analysis of the sale process, by itself, cannot support a reasonable inference that fair market value was tendered, especially given that TKAST must overcome the presumption that prior subsidies remain countervailable.

### ii. OBJECTIVE VALUATIONS AND THE CONCLUSION THAT FAIR MARKET VALUE WAS TENDERED

Commerce implicitly recognized this short-coming and proposed an additional justification that the sale price was at, or above, fair market value.  See Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 12 ("However, as discussed in the Analysis section above, we continue to find that certain other aspects of the bidding process might have served to limit the number of bidders.  Nevertheless, the three independent valuations of AST show that the GOI received fair market value for AST . . . . The valuations provide relevant evidence that the real or perceived restrictions did not result in

a non-competitive skewed process.").[11]  Commerce looked at three independent valuation studies of AST conducted by disinterested third parties.   Finding that the sale price was above AST's valuation in these studies, Commerce concluded that at least fair market value was tendered by TKAST.  Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 12, Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 9.

Before proceeding to analyze whether Commerce's conclusion is supported by substantial evidence, the Court notes that Commerce discussed this as part of its "objective analysis" of its process of sale analysis.  According to the Court's reading of Commerce's methodology, the process of sale analysis looks into the manner the sale was conducted.[12]  Consequently, following Commerce's "process"

---

[11]The Court further notes that the Determination's discussion on fair market value incorporates the Confidential Determination, Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 4, which placed weight on the fact that the bid was above the valuation studies' estimate, Confidential Determination,  C.R. Doc. No. 11, Pl.'s Ex. 9 at 9.

[12]By way of comparison, 19 U.S.C. § 1592(e) authorizes Customs to seek damages against parties who negligently or fraudulently misclassify their products entering the United States.  According to the case law, a defendant may assert a defense that he acted with reasonable care, inter alia, if he obtained the advice of counsel, and relied on that advice, in classifying his products. United States v. Optrex Am., Inc., slip op. 04-79 (CIT July 1, 2004).  In allowing this defense, the case law is not suggesting that counsel's advice was accurate – rather, if the Government is prosecuting a claim, most likely that advice was wholly erroneous.  Rather, it is the fact that advice of counsel was sought which demonstrates that the defendant exercised reasonable care.  In other words, it is the process of seeking advice that is probative, not the actual

methodology, it is the fact that a government sought objective valuations, and relied on those valuations, that is important.  But by using the valuations to prove the sale price was for fair market value, Commerce is comparing a resulting sale price to a benchmark. Commerce is not using the valuations to prove the validity of the <u>procedure</u> used to sell the company.  In so doing, Commerce opens the door to claims that the valuation studies were inaccurate.[13] Moreover, by opening the door to a claim that it was not following its own methodology, Commerce undermines its own contention that there were no "benchmarks" by which to compare the sale price.  In fact there were: the valuation studies.

Setting aside this methodological objection, Allegheny seeks to discredit the valuations as having been engineered by the GOI to boost projections of future rates of return at the expense of devaluing the present value of AST.[14]  In assessing Allegheny's

---

advice received.

[13]The accuracy of the valuations may, or may not, be relevant to whether a government sought objective advice and reasonably relied on those valuations.

[14]At oral argument, the Government and TKAST argued that Allegheny did not raise this argument before Commerce and waited until its reply brief to raise the argument in this proceeding. The Court agrees that arguments not raised before Commerce may not be raised before a reviewing court and that a party may not raise an argument for the first time in its reply brief. However, the Court deems that Allegheny adequately raised this argument below, <u>see</u> Petitioner's Case Brief, Attachment to Letter from David A. Hartquist, Kathleen W. Cannon & Eric R. McClafferty, Collier Shannon Scott, PLLC, to Sec'y of Commerce, Re: <u>Stainless Steel Sheet and Strip in Coils from Italy</u>, C.R. Doc. No. 9 at 12-14 (Sept. 26, 2003)at 12-14, and adequately

argument, the Court is mindful that courts grant considerable deference to an agency's review of valuation studies.  Cf. New Haven Inclusion Cases, 399 U.S. 392, 434-35 (1970) ("'The judicial function is to see to it that the Commission's 'estimate' is not a mere 'guess' but rests upon an informed judgment based upon an appraisal of all . . . relevant . . . facts . . . , and is not at variance with the statutory command.'") (quoting Freeman v. Mulcahy, 250 F.2d 463, 473 (1st Cir. 1957)) with Allegheny, 367 F.3d at 1344 (noting the Commerce must consider all the facts and circumstances behind a privatization).  Consideration of valuation studies requires extensive fact finding and expertise a court does not have when reviewing agency determinations.  This does not mean that agencies have carte blanche to ignore facts, misread studies, or otherwise use valuation studies such that their factual findings are unsupported by substantial evidence.  Id.  The agency must explain its rationale in adopting a valuation study such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations.  Id.

Granting this deference owed to Commerce, the Court nonetheless finds that, in this case, Commerce has not adequately explained its adoption of the valuation studies, especially in light of Allegheny's objections.  In its determination, Commerce

---

raised this argument in its initial brief before the Court, Pl.'s Mem. at 21-27.

noted that "[w]e consider these studies timely as they were conducted prior to the agreement on the final transaction price. Further, the studies are objective and complete since they were conducted by independent parties and contained information typically considered by sellers contemplating such a sale." Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 5. Allegheny challenges the IMI study's write-down of certain assets and addition of certain "provisions" to AST's balance sheet, and claims that the two subsequent studies adopted these distorted values. Pl.'s Mem. at 21-27. Commerce did not address these concerns in its Determination.[15] Nor did Commerce make a determination that the studies reflected any of the committed investment requirements or that the concurrent subsidies were reflected in the IMI or Pasfin studies.[16]

---

[15]In its market distortion analysis, Commerce argues that it does not have to address the GOI decisions about which assets and liabilities to place in AST because these decisions were not in the nature of a governmental function or governmental regulation but instead were similar to the action of a private seller. Determination, P.R. Doc. No. 33, Pl.'s Ex. 1 at 14. This response does not in any way validate Commerce's decision to rely on the valuations in determining fair market value.

[16]The Court is mindful that Commerce only made an explicit finding that the Morgan Grenfell valuation study considered AST's debt after AST's debt write-down in December. See Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 7. Commerce never indicated that the other two studies included the concurrent subsidies or that any of the studies contemplated any committed investment requirements. Cf. Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 7. The fair market price for AST should reflect AST's "core value" combined with the value of any prior and concurrent subsidies (subsidies

It is not inappropriate for Commerce to rely on valuation studies when, and to the extent, these valuation studies consider all of the facts and circumstances of the value of a privatized firm.[17]  However, when a valuation study, or valuations studies, have not considered all the facts and circumstances, reliance thereon is misplaced.  <u>Cf.</u> <u>Delverde III</u>, 202 F.3d at 1367.  Because a court does "not defer to the agency's conclusory or unsupported suppositions," <u>McDonnell Douglas Corp. v. United States Dept. of the Air Force</u>, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (citing <u>Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)), Commerce's adoption of these

---

conferred during the privatization of a company) and committed investment requirements.  Accordingly, the prior subsidy and concurrent subsidy analyses are inextricably linked when Commerce infers fair market value from valuation studies.  Consequently, either the purchasing firm remunerated the government for of all of these values or did not remunerate the government for all of these values.  Moreover, the Court notes that although some conclusions may be logically deducible from the facts, e.g., that the committed investments would lower the valuation therefore any error would be harmless or that the IMI study was based on the same level of debt write-off that actually occurred five months after the study was commissioned, Commerce must make these considerations explicit.  <u>Cf.</u> <u>Siderca v. United States</u>, slip op. 04-133 (Oct. 27, 2004) at 29 n.15 (noting that the Court should not be left to guess if Commerce considered certain facts and how it reached its conclusions); <u>see also</u> <u>infra</u> note 18.

[17]The Court is not implying that Commerce must accept or reject a valuation study in total.  Rather, it may be appropriate for Commerce to adopt such portions as it deems relevant, add, and detract values so as to determine the true valuation of assets.

studies cannot be grounded in substantial evidence.[18]  Furthermore,

whatever the merits of Commerce's and TKAST's arguments before the

Court, such arguments cannot be a substitute for a reasoned

decision by the agency on the record.  Al Tech Specialty Steel

Corp. v. United States, slip op. 04-114 at 51 (CIT Sept. 8, 2004)

---

[18]Other anomalies give the Court pause.  First, the price
TKAST bid for AST was actually higher than the valuation range
provided by the study it commissioned and the price it eventually
paid was significantly higher than the maximum valuation for AST.
Confidential Determination, C.R. Doc. No. 11, Pl.'s Ex. 9 at 7.
Second, IRI did not rely very heavily on its valuation studies.
After receiving a bid that was noticeably higher than the
projected value for AST, Confidential Determination, C.R. Doc.
No. 11, Pl.'s Ex. 9 at 7, IRI then proceeded to negotiate a price
for the following months, id. at 3.  This does suggest that IRI
was interested in securing the highest obtainable price for AST,
but also, that it did not place great weight on the studies.  At
oral argument, TKAST presented an explanation for this, i.e.,
that during the post-bidding negotiations changes occurred which
may have changed the value of the assets on the table.  Oral
Argument Before Judge Donald C. Pogue in Allegheny Ludlum v.
United States, Jan. 18, 2005 at 1:58:56 (statement of Lewis E.
Leibowitz).  However, this explanation did not appear in the
Determination and therefore constitutes a post-hoc
rationalization.  Moreover, TKAST's argument casts doubt on
whether any of the valuation studies was completely based on the
transaction that actually occurred.  If there were negotiations
regarding the assets TKAST would assume, which changed from the
assets the valuation studies valued, then these valuation studies
could not have been "complete" or "timely."  To make a
determination as to whether a valuation study is timely or
complete, Commerce must make an express determination that a
valuation study valued the total package being sold, adjust the
valuation study to reflect the total package being sold, or
explain why any changes between the assets considered in the
valuation study did not materially deviate from the valuation of
the assets sold, if it wants to rely on valuation studies. In
sum, Commerce must make a determination that no benefit was
conferred because the purchaser fully remunerated the government
for the  "package" of assets acquired – whatever form the
subsidy/subsidies assume(s).  See 19 U.S.C. 1677(5)(B) &
(E)(iv); see also Delverde, 202 F.3d at 1364-67.

(citing <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168-69 (1962)).  Accordingly, the Court remands this case to Commerce to consider Allegheny's objections to the valuation studies.[19]

## B. IF FAIR MARKET VALUE WAS CONFERRED, ALLEGHENY HAS NOT OVERCOME THE PRESUMPTION THAT FAIR MARKET VALUE EXTINGUISHED THE SUBSIDY

If Commerce concludes that fair market value has been tendered, the presumption shifts, i.e., the presumption then becomes that the subsidy was extinguished, but the presumption, in turn, may be rebutted upon a showing that the sale process was distorted through government intervention.  <u>Methodology</u> 68 Fed. Reg. at 37,127.  The Methodology defines this consideration as follows:

> A party can, however, obviate this presumption of extinguishment by demonstrating that, at the time of the privatization, the broader market conditions[] necessary for the transaction price to reflect fairly and accurately the subsidy benefit were not present, or were severely distorted by government action (or, where appropriate, inaction).[]  In other words, even if we find that the sales price was at "market value," parties can demonstrate that the broader market conditions were severely distorted by the government and that the transaction price was meaningfully different from what it would otherwise have been absent the distortive government action.

---

[19]Allegheny has also raised objections as to Commerce's concurrent subsidies methodology.  Because the Court has considered concurrent subsidies in context of the prior subsidies analysis, the Court deems any further discussion unnecessary until Commerce issues a remand determination.  Allegheny may raise any properly preserved arguments at that time.

Id. (footnotes omitted); cf. United States - Countervailing Measures Concerning Certain Products from the European Communities, WT/DS212/AB/R (Dec. 9, 2002) at 62 ("However, governments may choose to impose economic or other policies that, albeit respectful of the market's inherent functioning, are intended to induce certain results from the market."). The regulations further specify what types of distortions will rebut the presumption that fair market value has been extinguished:

> 1. Basic Conditions: For example, are the basic requirements for a properly functioning market sufficiently present in the economy in general as well as in the particular industry or sector, including free interplay of supply and demand, broad-based and equal access to information, sufficient safeguards against collusive behavior, effective operation of the rule of law, and adequate enforcement of contracts and property rights?
>
> 2. Legal and Fiscal Incentives: Has the government used the prerogatives of government in a special or targeted way that makes possible, or otherwise significantly distorts the terms of, a sale in a way that a private seller could not, e.g., through special tax or duty rates that make the sale more attractive to potential purchasers generally or to particular (e.g., domestic) purchasers, through regulatory exemptions particular to the privatization (or privatizations generally) affecting worker retention or environmental remediation, or through subsidization or support of other companies to an extent that severely distorts the normal market signals regarding company and asset values in the industry in question?

Id.

Allegheny contends that through repeated bailouts and other

manipulations of the Italian steel sector, the GOI distorted the market.  Pl.'s Mem. at 28-31.  Allegheny asserts that, without government assistance, AST would have gone bankrupt long before its privatization.  Id. at 29-30.  Although this consideration is not a type of distortion envisioned by the methodology, because Commerce must consider all of the facts and circumstances of a privatization, the Court will read Commerce's methodology broadly and will consider all distortions raised by the parties that may be lawfully considered relevant.  See Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1322 (Fed. Cir. 2000) (noting the presumption that agencies act in accordance with law); see also Methodology Fed. Reg. at 37,127 (noting the list includes only "some factors" that might be considered).  Nevertheless, even under this reading of Commerce's methodology, the Court is not persuaded that Allegheny's arguments are sufficient to carry its burden.

First, under countervailing duty law, the inquiry focuses on whether a purchasing firm received a financial contribution and benefit.  See Delverde III, 202 F.3d at 1367 (the statute requires "Commerce to make a determination that a purchaser of corporate assets received both a financial contribution and benefit from a government, albeit indirectly through the seller, before concluding that the purchaser was subsidized.") (emphasis added), cf. Uruguay Round Trade Agreements Act Statement of Administrative Action, H. Doc. 103-316 at 257 (1994) ("subparagraph (E) reflects the

'benefit-to-the-recipient' standard which long has been a fundamental basis for identifying and measuring subsidies under U.S. CVD practice, and which is expressly endorsed by Article 14 of the Subsidies Agreement."). When a sale is for fair market value, the true value of the subsidy has, at least theoretically, been factored into the purchase price. At this price, a purchaser whose reservation price is at fair market value should be indifferent to buying the company or assets or investing its money elsewhere. Consequently, the purchaser would not be the receiver of this "benefit" as required by law.

For example, a government may build a state-of-the-art facility for the production of widgets even though the factor costs in that country, e.g., labor or resource costs, place that country at a significant comparative disadvantage in the operation of the facility. When the government sells the facility, theoretically, these high factor costs will be considered in the purchase price – they will depress the purchase price (from the construction price) to reflect these high factor costs. The ultimate purchaser does not necessarily receive a benefit because it pays the value of the facility given market conditions (assuming the facility is sold under competitive market conditions) – the market should price the facility at the point where it is just profitable enough to justify the operation of the facility. At least part of the money the government spent would be a sunk cost (and sunk benefit) and does

not confer a benefit on the purchaser.  Cf. Certain Steel Products

from Austria, 58 Fed. Reg. 37,217, 37,264 (DOC July 9, 1993) (final

affirmative countervailing duty determination).[20]

Second, as the WTO Appellate Body has recently concluded:

[O]nce a fair market price is paid for the equipment, its
market value is redeemed, regardless of the utility the
firm may derive from the equipment.  Accordingly, it is
the market value of the equipment that is the focal point
of analysis, and not the equipment's utility value to the
privatized firm.

United States – Countervailing Measures Concerning Certain

Products from the European Communities, WT/DS212/AB/R (Dec. 9,

2002) at 51.  In this case, given that Commerce's methodology

and its Section 129 determination are intended to implement

WTO rulings, this factor is relevant.  See SEC v. Chenery

Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an

administrative order must be judged are those upon which the

record discloses that its action was based.").  Additionally,

the WTO Appellate Body decisions have persuasive weight here

---

[20]The Court has some discomfort with the fact that a
government may induce its industry to compete against U.S.
industries through use of devices such as committed investment
requirements.  For example, by a government requiring a company
to maintain production for a period of time, and so reducing the
purchase price to make this feasible, that government is
injecting distortions into the international market, i.e.,
creating potential competition that would not exist but for
government intervention.  Nevertheless, the Court is constrained
by the case law to disregard this type of distortion because
there is no benefit to the purchasing firm.  Such constraint,
however, does not limit the requirement that Commerce determine
that no benefit be conferred on the purchasing firm.

because nonconformance of U.S. practice may result in retaliatory tariffs against U.S. exporters – a result that negates the U.S.'s benefit from the international agreement. Cf. McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21 (1963). Accordingly, were the agency to construe an ambiguous statute so as to benefit domestic interests in violation of international agreements, retaliatory tariffs would result, a penalty which Congress presumably would wish to avoid. Consequently, courts should prefer adhering to international law standards unless otherwise indicated by Congress. See, e.g., id. at 20-21; cf. The Federalist No. 3, at 43 (John Jay) (Clinton Rossiter ed., 1961) ("It is of high importance to the peace of America that she observe the laws of nations towards [its treaty partners], and to me it appears evident that this will be more perfectly and punctually done by one national government . . . .); see also Allegheny, 367 F.3d at 1348 (citing Murray v. Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804)) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . as understood in this country."); Federal Mogul Corp. v. United States, 63 F.3d 1572, 1582 (Fed. Cir. 1995). Because Congress has not statutorily created an unavoidable conflict with the WTO, cf. The Chinese Exclusion Case, 130 U.S. 581 (1889), there exists

no reason not to look to the WTO for assistance in interpreting U.S. law.  See 19 U.S.C. § 3512 ("no provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect") (emphasis added).

Allegheny appears to base its distortion argument not on the market value, but on the utility value of these past distortions.  Based on the record as it stands, the Court cannot conclude that these past distortions can provide a basis to overcome the presumption that a purchase at fair market value extinguished the subsidy.

### CONCLUSION

Commerce's determination that fair market value was tendered is not supported by substantial evidence.  On remand, Commerce must reconsider its determination consistent with this opinion. If Commerce continues to rely on the valuations studies, Commerce should justify its use of the valuation studies in face of Allegheny's challenges.  Finally, Commerce must reconsider its analysis of concurrent subsidies in accordance with this opinion.

Commerce shall have until May 9, 2005 to submit its remand determination.  The parties shall have until May 23, 2005 to submit comments on the remand determination.  Rebuttal comments shall be

submitted by June 6, 2005.


SO ORDERED.


                                         /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge



February 8, 2005

New York, New York